Maxine SUTTON, Appellant,

v.

BANNER LIFE INSURANCE
CO., et al., Appellees.

No. 94–CV–927.

District of Columbia Court of Appeals.

Argued Dec. 8, 1995.

Decided Dec. 30, 1996.

Michael R. Murphey, Washington, DC, for appellant.

William C. Davis, III, Rockville, MD, for appellee Banner Life Insurance Company.

Stanley L. Lipshultz, Silver Spring, MD, for appellee Ronald Holmes.

Before TERRY and RUIZ, Associate Judges, and GALLAGHER, Senior Judge.

RUIZ, Associate Judge:

Appellee Banner Life Insurance Company denied appellant Maxine Sutton's claim for a death benefit under her husband's life insurance policy following his suicide, on the ground that the suicide occurred within two years of the policy date and was therefore barred by the policy's suicide clause. Sutton brought this action, contending that the policy containing the term upon which Banner Life relies was not a new policy, but should be interpreted as only an increase in coverage over an earlier policy containing a similar clause, the terms of which had already been satisfied. Appellant also claimed in the alternative that even if under the terms of the policy the two-year suicide exclusion were to start to run anew, she should not be held to its terms, because Banner Life's agent, appellee Ronald Holmes, had misrepresented the nature of the change in policies. The trial court granted summary judgment for Banner Life and Holmes. We hold that the trial court erred in granting summary judgment because there was a disputed issue of material fact as to what were the terms of

the life insurance contract between the parties in 1988, when Mr. Sutton committed suicide. Therefore, we reverse the grant of summary judgment on the contract claim as to Banner Life. Because Sutton has pointed to no fact or law establishing in Holmes or Banner Life a duty affirmatively to disclose any more than they in fact did, we affirm summary judgment on the fraud claim.

## I.

We review a grant of summary judgment *de novo* to ensure that there is no genuine issue of material fact and that the prevailing parties, here Banner Life and Holmes, are entitled to judgment as a matter of law. *Colbert v. Georgetown Univ.*, 641 A.2d 469, 472 (D.C.1994) (en banc). In ascertaining the facts as to which there is no genuine dispute, we view the record in the light most favorable to Sutton, the party opposing the motion. *Id.*

The facts we consider are that in 1979, Sutton's husband obtained a whole life insurance policy in the amount of $35,000 from Government Employees Life Insurance Company (GELICO), not a party to this action. The premium was $45.26 per month. As a whole life policy, it had a cash value that increased as the Suttons paid premiums. The policy contained the following suicide provision:

> In the event of the suicide of the Insured while sane or insane within two years from the Issue Date, the amount payable under this policy shall be limited to the amount of premiums paid.

Sometime during or before 1985, appellee Banner Life succeeded to GELICO's rights and obligations under the policy. Banner Life wrote to the Suttons in July 1985, apparently because it was concerned that the Suttons were thinking of cancelling their policy. It urged the Suttons to consider certain facts before surrendering the policy. Among those facts were the continuing increase in

the cash value of the policy and the potential increased cost and difficulty of obtaining other life insurance. The Suttons continued with the policy.

In the fall of 1988, appellee Holmes contacted the Suttons to suggest that they increase the amount of their policy with Banner Life. In an affidavit filed in opposition to appellees' motion for summary judgment Sutton stated:

> We met with Mr. Holmes at our house in late October, 1988, and he explained to us that the coverage of the policy could be increased from $35,000 to $50,000. At no time did he inform either my husband or me that in increasing the policy benefits a new two (2) year period would begin for suicide exclusion or contestability. We were not shown a copy of the prospective new policy, nor given the opportunity to review its terms and conditions. The only aspect of the policy discussed was the amount of the coverage and the amount of the premiums. Based on Mr. Holmes' representations, my husband agreed to the increase in coverage.

Banner Life thereafter issued to Mr. Sutton a universal life insurance policy in the amount of $50,000. Although bearing the signatures of officials of Banner Life, the policy is not signed by either of the Suttons.[1]

The new policy provided that its issue date was November 4, 1988. The initial planned annual premium was $543.12, the same as under the 1979 policy. Thereafter, premiums payable under the policy were flexible. The policy stated that under Internal Revenue Service regulations the maximum annual premium consistent with tax treatment as a life insurance premium was $1,131.99. The policy also contained the following suicide exclusion provision:

> For the first two full years from the date of issue, the Company will not pay if the insured commits suicide, while sane or insane. The Company will terminate the

[1]. On the cover of the policy was printed the following:

> **Read This Notice Carefully**—This policy is a legal contract between the policy owner and Banner Life Insurance Company. Within 20 days after this policy is received, it may be

> returned to the agent through whom it was purchased or to the Home Office of the Company. The Company will then refund any premium paid and the policy will be deemed void from the beginning.

policy and give back the premiums paid less any loan and any partial surrender amount [previously paid].

A like limitation applies to any increase in benefits and the effective date of such increase. The company will give back the monthly deductions for the increased specified amount as a death benefit as of the effective date of such increase in specified amount.

Approximately twenty months after Banner Life issued the 1988 policy, Sutton's husband committed suicide. Relying on the suicide exclusion provision of the 1988 policy, Banner Life refused to pay Sutton the face value of the policy. Instead, according to Banner Life's statement of undisputed facts, it "paid to Plaintiff all premiums accrued on the Banner Life insurance policy to the date of the Decedent's death, *as well as the cash surrender value of the insurance policy,* totalling" $2,401.66. (Emphasis added.) That amount is more than the maximum premium payable under the 1988 policy for the prior two years.

Sutton brought this action against both Banner Life and Holmes, demanding judgment for the amount of the 1979 policy, $35,000, less the amount already paid out by Banner Life. She did not claim the face amount of $50,000 under the 1988 policy. She alleged that Banner Life had breached its obligation under both policies and that Holmes, as Banner Life's agent, had fraudulently or negligently failed to disclose that a new two-year suicide exclusion period would commence if the Suttons agreed to an increase in the indemnity amount.

The trial court granted Banner Life's and Holmes' motion for summary judgment, reasoning that

[t]he insurance policy between [defendant] Banner Life and the decedent constituted an entirely new [contract] and the decedent as well as any intended beneficiary are bound by its terms. The Court is aware of no precedent which requires that the agent, [defendant] Holmes[,] specifical-

ly highlight the provision regarding suicide. Moreover the complaint in no way sets forth with sufficient particularity any fraud claim or claims for neg[ligent] misrep[resentation.]

## II.

In essence, Sutton's evidence shows that in 1988 her husband and Banner Life agreed to increase by $15,000 the face value of the policy, apparently in exchange for a lower rate of increase in the policy's cash value.[2] From this evidence, Sutton contends that the reasonable expectations of the parties as shown by the circumstances of their transaction should be given effect by excluding application of the suicide clause with respect to the face amount of the earlier policy. Banner Life contends, however, that the courts are bound by the terms of the form contract Banner Life subsequently provided to the Suttons expressing different terms. We conclude that there are material facts in dispute which preclude a legal determination of the operative terms of the life insurance contract in existence between the parties in 1988. In order to elucidate the relevant material facts, we turn to a consideration of the applicable law of contracts.

■ A basic principle of contract law we have expressed is that, presumptively, written contracts are to be enforced according to their terms, unless the writing is ambiguous or there is fraud, duress, or mutual mistake. *Minmar Builders, Inc. v. Beltway Excavators, Inc.,* 246 A.2d 784, 786 (D.C.1968) (quoted in *Howard Univ. v. Best,* 484 A.2d 958, 967 (D.C.1984)). This principle rests on the assumption that the terms expressed in a written contract embody the agreement of the parties. Even before the written terms of a contract are interpreted and applied, however, we must ascertain that they are the terms binding upon the parties. That is the question presented by this case.

Sutton's argument is essentially that with respect to her claim in this case for the

---

**2.** Although the Suttons' "planned premium" was, at least nominally, unchanged, the cost of insurance presumably increased. Because the cost of insurance is deducted from the premium in the calculation of cash value, the result of a policy providing higher coverage for the same premium would be a reduction in the rate of increase in the policy's cash value.

$35,000 coverage provided for in the 1979 policy, the terms of the contract were those contained in the 1979 insurance policy, without regard to the amendment in 1988, which was only intended to effect an increase in coverage from $35,000 to $50,000. This view of the contract, according to Sutton, is borne out by the discussions with Holmes, as described in Sutton's affidavit.

In support of her position, Sutton points us to the Arizona Supreme Court's decision in *Darner Motor Sales v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 682 P.2d 388 (1984). In *Darner Motor*, the plaintiff insured was in the automobile leasing business. *Id.*, 682 P.2d at 390. It had obtained from the defendant insurer a "U–Drive" policy that covered it for up to $100,000 for one injury and $300,000 for one accident and its lessees for similar risks in the amounts of $15,000 and $30,000. *Id.* When the policy came up for renewal, the insured decided to obtain all its insurance from the defendant insurer, including an "umbrella" policy. *Id.* Simultaneously, the insured examined the U–Drive policy and discovered that it provided only 15/30 limits for its lessees. *Id.* Concerned that the car rental agreement offered 100/300 coverage for lessees and thinking that higher coverage would be better for business, the insured contacted the insurer's agent, who allegedly gave assurances that the umbrella policy would provide 100/300 coverage for lessees. *Id.* After receiving those assurances, the insured received a copy of the umbrella policy, which "was evidently quite lengthy and forbidding" and which the insured admitted to never having read. *Id.* at 391. When one of the insured's lessees hit a pedestrian, however, the insured quickly learned that under the printed terms of the umbrella policy, injuries caused by the insured's lessees were not covered. *Id.*

The insured brought suit against the insurer, seeking indemnity for the $60,000 he had to provide to his lessee under the car rental agreement. After paying $15,000 under the U–Drive policy, the insurer denied any further liability under the umbrella policy, relying on the written terms of that policy. *Id.* The trial court granted summary judgment for the insurer, applying the unambiguous terms of the umbrella policy; the court of appeals affirmed. *Id.*

The Arizona Supreme Court reversed the grant of summary judgment, taking as its starting point Corbin's observation that " '[t]hat portion of the field of law that is classified and described as the law of contracts attempts the realization of *reasonable expectations that have been induced* by the making of a promise.' " *Id.* at 394 (quoting 1 ARTHUR L. CORBIN, CONTRACTS § 1, at 2 (1963)). Where there is a written agreement, these expectations are usually contained exclusively in the express provisions of the document. Where the term sought to be enforced is part of a form contract, however, which contains "boilerplate" that is not bargained for and may even go against otherwise agreed-upon terms,[3] in ascertaining the terms of a contract "account should always be taken of all the surrounding circumstances to determine the extent of integration *and* the interpretation of the agreement." *Id.* at 398.

In light of the foregoing, the *Darner Motor* court adopted § 211 of the RESTATEMENT (SECOND) OF CONTRACTS:

(1) Except as stated in Subsection (3), where a party to an agreement signs or otherwise manifests assent to a writing and has reason to believe that like writings are regularly used to embody terms of agreements of the same type, he adopts the writing as an integrated agreement with respect to the terms included in the writing.

(2) Such a writing is interpreted wherever reasonable as treating alike all those simi-

---

3. The court noted that the utility of the form contract depends upon that very feature:

> [S]tandardization of agreements is essential "to a system of mass production and distribution. Scarce and costly time and skill can be devoted to a class of transactions rather than to details of individual transactions.... Sales personnel and customers are freed from atten-

tion to numberless variations and can focus on meaningful choice among a limited number of significant features: transaction-type, style, quantity, price or the like. Operations are simplified and costs reduced, to the advantage of all concerned."

*Id.* at 396 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 211 cmt. a (1979)).

larly situated, without regard to their knowledge or understanding of the standard terms of the writing.

(3) Where the other party has reason to believe that the party manifesting such assent would not do so if he knew that the writing contained a particular term, the term is not part of the agreement.

(RESTATEMENT (SECOND) OF CONTRACTS § 211) quoted in *Darner Motor,* 682 P.2d at 396.

Relying on subsection (3) and finding that "[i]t is for the trier of fact to determine whether, under circumstances such as this, the appellant had a duty to read," *id.,* at 400, and whether the insurer's agent knew of the insured's expectations or negligently misled the insured, *id.* at 401 and 403, the *Darner Motor* court concluded that summary judgment was improper. Determination of those facts was essential before the court could apply the traditional doctrines of estoppel, reformation and negligent misrepresentation which underlie section 211(3).

■ We agree with the Arizona Supreme Court's approach in *Darner Motor* adopting section 211(3) of the RESTATEMENT, which is consistent with the law in this jurisdiction. This court has found the first subsection of section 211 to be persuasive authority. *See Bolle v. Hume,* 619 A.2d 1192, 1197 n. 6 (D.C.1993); *Hercules & Co. v. Shama Restaurant Corp.,* 613 A.2d 916, 928 n. 18 (D.C. 1992). The United States Court of Appeals for the District of Columbia Circuit has relied upon subsection (3). *Lowey v. Watt,* 221 U.S.App. D.C. 435, 449, 684 F.2d 957, 971 (1982).

■ Furthermore, section 211 of the RESTATEMENT, insofar as it relates to the parol evidence rule, is consistent also with District of Columbia practice. The District of Columbia adheres to the modern view regarding admissibility of evidence of circumstances both in determining whether a contract is integrated, *Howard Univ. v. Good Food*

*Servs.,* 608 A.2d 116, 127 (D.C.1992) (relying on RESTATEMENT (SECOND) OF CONTRACTS § 214), and in interpreting the terms of a contract, *District of Columbia v. C.J. Langenfelder & Son,* 558 A.2d 1155, 1159 (D.C. 1989). Essentially, the parol evidence rule excludes proof of facts and subjective intentions not shared by the parties and evidence of prior and contemporaneous agreements, unless the terms of the agreement are ambiguous. In the context of determining whether a form document is integrated, Section 211(3) permits the court to refer to circumstances outside the writing, to exclude terms of a form contract where the party asserting the term had reason to believe that it would not have been agreed to by the other party.

Moreover, the principle embodied in section 211(3) is closely related to other rules governing the interpretation and construction of contracts that have been applied by this court. Comment f to section 211 of the RESTATEMENT notes that the policy underlying subsection 3 is closely related to the policy against unconscionable terms. In *Williams v. Walker–Thomas Furniture Co.,* 121 U.S.App. D.C. 315, 350 F.2d 445 (1965), the court held that a term in a form time sales agreement could be unenforceable because unconscionable. The court reasoned that:

Ordinarily, one who signs an agreement without full knowledge of its terms might be held to assume the risk that he has entered a one-sided bargain. But when a party of little bargaining power, and hence little real choice, signs a commercially unreasonable contract with little or no knowledge of its terms, it is hardly likely that his consent, or even an objective manifestation of his consent, was ever given to all the terms.

*Id.* at 319, 350 F.2d at 449 (footnote omitted).[4]

---

4. The court in *Williams,* like the Arizona Supreme Court in *Darner Motor,* relied in part on Dean Llewellyn's discussion of boilerplate agreements. *See Williams, supra,* 121 U.S.App. at 320 n. 10, 350 F.2d at 450 n. 10; *see, e.g.,* K.N. LLEWELLYN, THE COMMON LAW TRADITION 362–363 (1960). "[F]orm-agreements tend either at once

or over the years, and often by whole lines of trade, into a massive and almost terrifying jughandled character; the one party lays his head into the mouth of a lion—either, and mostly, without reading the fine print, or occasionally in hope and expectation (not infrequently solid) that it will be a sweet and gentle lion."

This court has previously followed the principle embodied in section 211(3) by rejecting the notion that a party to a contract is bound by its own mistake in expressing a term in a written agreement, where, under the circumstances, the party claiming benefit from the mistake understood the original terms of the agreement and could not have reasonably relied upon the mistake. *See Simons v. Federal Bar Bldg. Corp.*, 275 A.2d 545, 551–52 (D.C.1971); *see also Flippo Constr. Co. v. Mike Parks Diving Corp.*, 531 A.2d 263, 271 (D.C.1987) (" 'Unilateral mistake' [is] a defense ... [if] one party is reasonably mistaken about a material aspect of the contract and ... the other party knew or should have known of that erroneous understanding."). In *Simons*, we rejected any approach that would "mold[ ] ... [a] generalization [concerning mistake] into a rigid rule of law." 275 A.2d at 551.

Similarly, even while enforcing a term contained in a form agreement, we have been careful to distinguish circumstances that amount to misrepresentation of expression. In *Isaac v. First Nat'l Bank*, 647 A.2d 1159 (D.C.1994), a bank customer sought to avoid the effect of a deposit agreement under which half of her deposit was offset by the bank because the joint tenant of the account had failed to pay a debt owed to the bank. In enforcing the account agreement against the bank customer, we distinguished a similar case from Ohio in which the court found in favor of the depositor, where the depositor had sought a means by which another could withdraw funds from her account in an emergency and was told by a bank employee that the appropriate means was a joint account. *Id.* at 1165 (discussing *Rives v. Krupzsield*, 60 Ohio App.3d 97, 573 N.E.2d 1199 (1989)). In *Isaac* we said that *Rives* involved "a situation which in fact closely resembled the fraud or misrepresentation that can nullify a contractual provision. *The bank simply did not do what the woman requested.*" *Id.* (emphasis added). Because *Isaac* did not involve a situation where the bank knew that the depositor's intent was *not* to open a joint account, we held the depositor to the terms of the deposit agreement. *Id.*

The foregoing cases all address by different means the same basic situation: The written term asserted by one party is contained in a form contract, in circumstances where the party asserting the term has no reasonable basis to believe that the other party had knowingly or would knowingly assent to the term. In such circumstances, enforcement of the written term does not further the policies underlying contract law, to "promot[e] and facilitat[e] reliance on business agreements." CORBIN, CONTRACTS § 1.1, at 3 (Joseph M. Perillo ed., rev. ed.1993) (quoting Lon L. Fuller & William R. Perdue, *The Reliance Interest in Contract Damages: I*, 46 YALE L.J. 52, 62 (1936)).

Of course, courts properly refuse to inquire into the subjective mental processes of each of the parties to a contract, except in the most compelling circumstances. To do so generally would place the party expecting future performance at the mercy of the one obliged to provide it, or perhaps vice-versa. Therefore, in departing from the general rule of objective interpretation of written terms, the courts look to circumstances known to *both* parties to ascertain what reliance could be reasonably induced—what expectations justifiably engendered—on the part of each party to the transaction.

What the above cases in this jurisdiction and section 211(3) do is to apply traditional concepts of contract law to the case of standardized form contracts. In adopting section 211(3), therefore, "we do not create a special field of contract law, we merely adopt a rule of integration which recognizes the method by which people do business." *Darner Motor, supra*, 682 P.2d at 397.

Having set out the applicable law, we conclude that Banner Life is not entitled to summary judgment because there are facts of record in this case which suggest that using language in the 1988 policy to deny Sutton's claim for the $35,000 coverage provided by the 1979 policy would be contrary to the reasonable expectations of both parties. On this record, therefore, there is a question of fact whether there were circumstances known to both parties from which the trier of fact could conclude that Banner Life either knew or should have known that the Suttons

had not and would not have agreed to a new two-year suicide exclusion period that would deprive them of their rights with respect to the $35,000 face value of the 1978 policy. If the trier of fact were to so find, the suicide exclusion provision of the 1988 policy would not apply to Sutton's claim with respect to the amount covered by the 1979 policy. By granting summary judgment to enforce the suicide term in the 1988 policy to bar any benefit under the 1979 policy without first resolving the factual issues in this case, we might be inventing an exchange neither made nor understood to have been made, rather than enforcing the one chosen voluntarily by the parties.

First, it must be determined what the Suttons reasonably understood in 1988 with respect to the $50,000 policy. According to Sutton's affidavit, "the only aspect of the policy discussed was the amount of the coverage and the amount of the premiums," and Holmes presented the 1988 policy as an "increase" to the 1979 policy, not as a new policy. Banner Life also appears to have treated the 1988 policy as an extension of the 1979 policy, because when Sutton's husband died, Banner Life paid back not only the premiums that had been paid under the 1988 policy, but also a "cash value." That cash value appears to have been the net accrued cash value under the 1979 policy. Because cash value represents a portion of the premium paid (premiums less cost of insurance), the payment of cash value under the 1988 policy would not be required under its terms, because it would amount to a double-refunding of the premiums. By its actions, in other words, Banner Life gives credence to Sutton's contention that Banner Life continued to be obligated under the 1979 policy.

Second, Banner Life's reasonable expectations with respect to the applicability of the 1988 policy's suicide provision must be determined. Life insurance suicide provisions address the concern that the insured will purchase insurance in contemplation of suicide, thereby defrauding the insurer. *See* ROBERT E. KEETON & ALAN I. WIDISS, INSURANCE LAW § 5.3(b)(3), at 481 (practitioners' ed.1988). Because at the time Banner Life issued the 1988 policy, Sutton's husband had already been insured in the amount of $35,000 for nine years, the only concern could be that he increased the policy to $50,000 in 1988 for the purpose of defrauding the company of $15,000; the Suttons' right to $35,000 in insurance, notwithstanding the insured's suicide, had already vested under the 1979 policy. The second paragraph of the suicide provision in the 1988 policy expressly recognizes that Banner Life considered it reasonable to start the two-year clock running again only with respect to the increase in coverage.

Finally, it is for the trier of fact to determine whether, under these circumstances, the Suttons should be bound to boilerplate printed terms in a policy that they decided not to read. From an objective perspective, Banner Life's issuance in 1988 of an entirely new policy, as opposed to an amendment or rider containing the higher coverage, could reasonably be explained by the fact that the prior policy had originally been issued by a different company to which Banner Life succeeded in interest. A reasonable insured could perceive the use of the new policy form as a mere convenience to the insurer, which presumably does not carry in stock the forms of its predecessors in interest. A reasonable insured might not suspect that the use of a current form would divest him of his accrued rights under a policy that he understood was merely being increased in face value.

If the trier of fact concludes that the Suttons acted reasonably under the circumstances in failing to read, understand or object to the suicide provision in the 1988 policy Banner Life provided to them following their negotiation with Holmes, and in considering it an extension of the 1979 policy, section 211(3) provides that if Banner Life had reason to believe that the Suttons viewed the 1988 policy as affecting only an increase in coverage, the Suttons are not deprived of rights accrued under the earlier policy. In such an event, the terms reasonably understood by the Suttons will govern. By her action, Sutton has shown that she expected that reasonable terms in the 1988 policy related to the increase in coverage would apply. Sutton claims a right to receive $35,000 upon her husband's death by suicide. By not

claiming the $15,000 increase agreed to within two years of Mr. Sutton's suicide, Sutton implicitly recognizes the reasonableness of the term of the 1988 policy (interestingly not contained in the 1979 policy) that expressly excludes payment of the amount of any increase in benefits if the insured commits suicide within two years of the effective date of the increase.

Those terms that do not comport with the bargained-for exchange, that in fact undercut it and could not be supposed by any reasonable person to have been a term that would meet with voluntary assent, will not govern. Viewed in the light most favorable to Sutton, the evidence in the record raises a question of material fact that requires the trier of fact to determine whether the suicide provision in the 1988 policy applies to bar recovery of the $35,000 benefit under the 1979 policy. Therefore, we conclude that Banner Life is not entitled to summary judgment as a matter of law.

### III.

In light of the foregoing disposition, Sutton's fraud claim may well become unnecessary. If, under the circumstances, Sutton had a justifiable expectation that the suicide clause would not be enforced with respect to the $35,000 coverage in the 1979 policy, she will recover on her contract claim. Regardless whether the fraud claim would or would not be necessary, however, Sutton has not pointed the court to any law or fact establishing a duty in Holmes or Banner Life to disclose any more than they did. Therefore, Banner Life and Holmes are entitled to summary judgment on Sutton's fraud claims.

We affirm the grant of summary judgment in favor of appellee on the fraud claim. We reverse the grant of summary judgment in favor of appellee on the contract claim and remand for trial of that claim.

*Reversed in part and remanded.*