**AIR LINE PILOTS ASSOCIATION,**
**Plaintiff,**

v.

**SHUTTLE, INC., Defendant.**

**No. Civ.A. 97–0908(PLF).**

United States District Court,
District of Columbia.

July 9, 1999.

Jerry D. Anker, Air Line Pilots Association, Washington, DC, for plaintiff.

Tom A. Jerman, O'Melveny & Myers, Washington, DC, for defendant.

## OPINION

PAUL L. FRIEDMAN, District Judge.

In a case that once again reaffirms the importance of proofreading, plaintiff brings this action to enforce the terms contained in the Shuttle, Inc. Fixed Benefit Retirement Plan for Pilots (the "Plan") regarding the pilots' disability benefits. The Plan was drafted in 1989 when Trump Shuttle, Inc., defendant's corporate predecessor, purchased the shuttle business of Eastern Air Lines.

In moving for summary judgment, defendant Shuttle, Inc. ("Shuttle") argues (1)

that this action should be dismissed for lack of subject matter jurisdiction and referred to arbitration because it is a "minor dispute" under the Railway Labor Act; or (2) that the terms of the Plan should be reformed in equity because they do not effectuate the parties' intent in the 1989 negotiations. Plaintiff Air Line Pilots Association ("ALPA") counters that the Plan's provisions regarding disability benefits are clear and unambiguous, reflect its intent in the 1989 negotiations and should be enforced by this Court as written. ALPA therefore requests that the Court enjoin Shuttle from changing the way in which it calculates disability benefits.

The matter is before the Court on the parties' cross motions for summary judgment. Upon consideration of the motions, the oppositions and the replies, and the arguments of counsel at the motions hearing, the Court denies both motions. The Court concludes that it has jurisdiction over this dispute because the language of the Plan is unambiguous and that there are genuine issues of material fact regarding ALPA's intent during the negotiation of the Plan. This matter therefore shall be scheduled for trial.

## I. FACTUAL BACKGROUND

*Defendant* Shuttle, Inc. operates an hourly airplane shuttle service between Washington, D.C. and New York and between New York and Boston. Shuttle began operations in June 1989 as Trump Shuttle, Inc. ("Trump") when Trump acquired the air routes and related assets of the Eastern Shuttle during Eastern Air Line's bankruptcy. Trump was later renamed Shuttle, Inc. after USAir, Inc. took over its operations in 1994 and began operating the USAir Shuttle. Shuttle adopted all of Trump's obligations that are relevant to this lawsuit, including the management of Trump's retirement and disability benefits plans.

In the Purchase and Sale agreement governing Trump's acquisition of Eastern's shuttle business, Trump agreed to offer employment to Eastern employees and establish employee benefits for Eastern's employees "which are identical to the applicable provisions in effect as of the Closing Date" of the sale. *See* .Conformed Shuttle Purchase and Sale Agreement as Amended by Amendment to Shuttle Purchase and Sale Agreement ("Purchase and Sale Agreement") at 32. When Trump offered employment to the former Eastern employees, Trump announced its intent to comply with the Purchase and Sale Agreement, stating that it "will establish fixed benefit and variable annuity plans *identical* to the comparable [Eastern] plans...." November 4, 1988 Letter from Bruce R. Nobles to Eastern Employees ("Nobles Letter") at 1 (emphasis added); *see also* November 4, 1988 Letter from Donald J. Trump to Eastern Employees ("Trump Letter"), Attachment at 2 ("The Purchase/Sale Agreement provides that Trump Shuttle will establish employee benefit plans which will have terms and conditions that in the case of fixed benefit and variable annuity plans, will be *identical* to those in effect at Eastern Airlines") (emphasis added).

With these statements as a backdrop, Trump began negotiations with ALPA in the Spring of 1989 to establish the employee benefit plans for the pilots Trump hired from Eastern. Trump made clear to ALPA during the negotiations that its intent "was to develop plans which had terms and conditions that were identical...." Deposition of Peter McGuirk, Chairman of the Retirement and Insurance Committee of the Air Lines Pilots Association ("McGuirk Deposition") at 22. ALPA also "did not ask [Trump] for something other than having identical terms and conditions," *id.*, but maintains that it did not think that identical "terms and conditions" necessarily would result in identical "benefits." Supplemental Declaration of Peter McGuirk ("Supp. McGuirk Decl.") ¶ 3.

One of the many provisions of the Eastern fixed benefits plan for pilots ("the

Eastern Plan") to be amended in the negotiations was the provision regarding the calculation of disability benefits. Because disability benefits were intended to be lifetime benefits that did not need to be supplemented, Section 5.7 of the Eastern Plan, governing pension offsets, provided that a pilot's disability benefits would be offset by the actuarial value of a pilot's balance under other Eastern retirement plans for pilots. *See* Letter of Agreement between Eastern Air Lines, Inc. and the Air Line Pilots § 5.7. Thus, once a pilot became disabled and was forced to retire for disability, the pilot would not receive the benefits from his or her regular retirement plans in addition to disability benefits.

After Trump purchased Eastern, negotiators for Trump and ALPA first took the Eastern Plan—a 79-page document—and marked it up by hand, replacing the word "Eastern" with the word "Trump" everywhere the word "Eastern" appeared. *See* Declaration of C. Raymond Grebey ¶ 8 ("Grebey Decl."); Supp. McGuirk Decl. ¶ 5. Of particular relevance to this case, this approach was used when amending Section 5.7 of the Plan.[1] Section 5.7 originally stated that the disability benefits calculated for *Eastern* pilots would be reduced or offset by the amount to which the Eastern pilots were entitled under other *Eastern* retirement plans. Section 5.7 was changed so that it now stated that disability benefits for *Trump* pilots would be reduced by the amount to which they were entitled under other *Trump* retirement plans. *Compare* Letter of Agreement between Eastern Air Lines, Inc. and the Air Line Pilots § 5.7 *with* Trump Shuttle Inc. Fixed Benefit Retirement Income Plan for Pilots § 5.7. Except for changing the word

*Eastern* to *Trump*, Section 5.7 remained the same as it was in the Eastern Plan. The language of the amended agreement took no account of any amount to which a former Eastern pilot was entitled under the Eastern retirement plans. The result was that a former Eastern pilot now at Trump could receive his or her accrued benefits under any Eastern retirement plans *in addition* to disability benefits under the new plan. Shuttle maintains that this was a mistake that did not reflect the intent of the parties. It simply did not recognize that the substitution of the word *Trump* for *Eastern* in Section 5.7 in fact would produce different and more generous disability benefits than had the Eastern Plan.

During the negotiations, the parties also formulated an alternative means of calculating benefits that was designed to ensure that the benefits realized by the former Eastern pilots were not reduced as a result of their transfer to Trump. The new provision, found in Section 5.1B of the Plan, sets out a formula intended to calculate the amount of benefits an Eastern pilot would have received if he or she had continued under the Eastern Plan. Under this provision, a former Eastern pilot is entitled to the greater of the amount he or she is due under Section 5.7 or Section 5.1B. Shuttle maintains that the purpose, goal and intent of this change was to provide benefits to the former Eastern pilots identical to those they would have received had Eastern survived and they had stayed at Eastern—no less, no more. *See* Grebey Decl. ¶¶ 9, 11.

Between 1990 and 1996, first Trump (and later Shuttle) calculated the disability benefits to which five pilots were entitled under the language of the new Section 5.7.[2]

---

1. When Shuttle adopted the plan negotiated by Trump, Section 5.7 of the agreement between Trump and ALPA became Section 4.7 of the plan between Shuttle and ALPA. For all relevant purposes, the language of the two sections is identical. For ease of presentation, the Court will refer to the provision as Section 5.7.

2. When Shuttle assumed the obligations of Trump, the provision was changed to state that disability benefits would be reduced by the amount to which a pilot was entitled "under any other retirement plans of the Employer...." Shuttle Inc. Fixed Benefit Retirement Income Plan for Pilots § 4.7(a). "Employer," in turn, was defined as "Shuttle,

They calculated the pilots' disability benefit under Section 5.3 of the Plan, governing the initial calculation of disability benefits, and then offset the amounts to which the pilots were entitled under the other Trump (or Shuttle) retirement plans.[3] They did not offset the amount due the pilots under the Eastern retirement plans. *See* Declaration of Peter McGuirk ("McGuirk Decl.") ¶¶ 12, 13. Thus, for example, if a pilot was entitled to $1000 a month in disability benefits, $200 a month under his or her Trump (or Shuttle) retirement plans and $500 a month under his or her Eastern retirement plans, the pilot would receive $800 a month in disability benefits ($1000 less $200) and would also receive $500 a month from the Eastern retirement plans.

When a sixth pilot, Michael Futterman, claimed disability benefits in August 1996, just a few months before reaching normal retirement age, the same calculation led Shuttle to conclude that Futterman would be receiving disability benefits over three times greater than the normal retirement benefit he would have received under the Plan had he not been disabled. Declaration of Sandra B. Respess ("Respess Decl.") ¶ 6. In fact, with no offsets for his years at Eastern, the amount that he would have received if only the Trump disability and benefits plans were considered was over $2500 per month more than he would have received if he had become disabled while at Eastern and over $1600 per month more than his final salary with Trump. *Id.* ¶ 11. After noting the inequity of this result, Shuttle asked Sandra B. Respess, an actuary, to recalculate the disability benefits to comport with Shuttle's view of the intent of the parties. Respess Decl. ¶ 7. Shuttle then suggested that ALPA accept a deal in which Futterman and other former Eastern pilots would receive disability benefits as calculated under

Section 5.7 until they retired, but then would receive only their regular retirement benefits. *See* McGuirk Decl. ¶¶ 16, 17, 19. ALPA rejected the offer.

Shuttle then announced that because it had previously miscalculated disability benefits, it was changing its policy to reflect the parties' true intent to reduce disability benefits by the amount due under *both* the Shuttle and Eastern retirement plans. Specifically, it said it would calculate benefits under the Shuttle Plan and then deduct benefits from the Eastern retirement plans to arrive at the proper amount. *See* McGuirk Decl. Exhs. 4, 5a–5e. In response, ALPA filed this action to enjoin Shuttle from implementing the change.

## DISCUSSION

### A. Jurisdiction under the Railway Labor Act

Subchapter II of the Railway Labor Act ("RLA") creates procedures for the resolution of labor disputes between airline carriers and their employees. *See* 45 U.S.C. § 181 *et seq.* Under the RLA, all labor disputes are either "major disputes" or "minor disputes." *See Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 302, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989); *Air Line Pilots Ass'n. Int'l v. Eastern Air Lines, Inc.*, 869 F.2d 1518, 1520 (D.C.Cir.1989). A minor dispute is one relating to the meaning or application of a particular provision of a collective bargaining agreement; it is subject to compulsory and binding arbitration and is outside the jurisdiction of this Court. *See Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. at 303–04, 109 S.Ct. 2477; *Air Line Pilots Ass'n. Int'l v. Eastern Air Lines, Inc.*, 869 F.2d at 1520; *Everett v.*

---

Inc., as the successor to Trump, and any successor company." *Id.* at § 1.20. This amendment created no substantive change that is relevant to this lawsuit.

**3.** Section 5.3(b) provided that disability benefits under certain subsections of Section 5.3 "shall be subject to the pension offsets described in Section 5.7." *See* Trump Shuttle Inc. Fixed Benefit Retirement Income Plan for Pilots § 5.3(b).

*USAir Group, Inc.*, 927 F.Supp. 478, 482 (D.D.C.1996). A major dispute allows a party to seek an injunction in federal court to preserve the status quo while the parties undergo a "lengthy process of bargaining and mediation." *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. at 302, 109 S.Ct. 2477; *see also Air Line Pilots Ass'n, Int'l v. Eastern Air Lines, Inc.*, 869 F.2d at 1520.

■ It is for the Court to decide whether a dispute is "major" or "minor." *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. at 307, 109 S.Ct. 2477. The test is as follows:

> Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major.

*Id.* The relevant inquiry therefore is whether the change in the calculation of disability benefits implemented by Shuttle in the wake of Mr. Futterman's request is "arguably justified by the terms" of the Plan. If not, ALPA has the right to invoke the jurisdiction of this Court.

■ Shuttle's change in the calculation is not "arguably justified by the terms" of the Plan negotiated by Trump and ALPA in 1989. The Plan states that a pilot's disability benefits "shall be reduced . . . by the amount of Pension payable to him [or her] on or before his [or her] Normal Retirement Date under any other retirement plans of *Trump.*" Trump Shuttle Inc. Fixed Benefit Retirement Income Plan for Pilots § 5.7(a) (emphasis added). There is no ambiguity in this sentence that could justify the subtraction of the amount due from the pilot's Eastern retirement plans as well as the amount due under the Trump retirement plans. "[A]ny other retirement plans of Trump" means "any other retirement plans of Trump," and nothing else.

■ In fact, the relief Shuttle requests in this Court—that the contract be equitably reformed—implicitly acknowledges that the terms of the Plan do not support its position. Otherwise, it would not have to ask an equity court for reformation. Arbitration under the RLA is only intended to resolve the dueling interpretations of the parties about the meaning of a provision of a collective bargaining agreement; it does not encompass the equitable reformation of an agreement. Equitable reformation is a remedy that is more appropriately granted by a court. *See, e.g., Cinelli v. Security Pacific Corp.*, 61 F.3d 1437, 1444–45 (9th Cir.1995); *Ramsey v. Colonial Life Ins. Co. of America*, 12 F.3d 472, 479–80 (5th Cir.1994); *International Union v. Murata Erie N. Am., Inc.*, 980 F.2d 889, 907–08 (3d Cir.1992). Shuttle's alteration of the calculation of disability benefits under the Plan therefore creates a "major dispute," and the Court must enjoin Shuttle from changing the status quo pending further bargaining or mediation—unless the Court reforms the Plan in equity.

### B. Equitable Reformation

■ Although ALPA brought this suit seeking only an injunction to prevent Shuttle from implementing a change in the calculation of disability benefits, Shuttle filed a counterclaim requesting that the Court reform the Plan in equity because of a "scrivener' error." The doctrine of scrivener's error, or *mutual* mistake, allows the reformation of a contract when clear and convincing evidence demonstrates that "a mistake [was] made in the drafting of an instrument so that the written agreement fails to express the true agreement of the parties." *Isaac v. First Nat'l Bank of Md.*, 647 A.2d 1159, 1163 & n. 10 (D.C. 1994) (quoting *Cafritz v. Cafritz*, 347 A.2d 267, 269 (D.C.1975)); *see also Ramsey v. Colonial Life Ins. Co. of Am.*, 12 F.3d at 479–80; *International Union v. Murata Erie N. Am., Inc.*, 980 F.2d at 907. Shuttle contends that both Trump and ALPA

intended to create disability benefits equal to but not greater than the disability benefits that would have been available under the Eastern plan but that they failed by their language to achieve their intent because of the summary method used to mark up the Eastern plan, simply substituting the word *Trump* for the word *Eastern* wherever it appeared. Shuttle therefore argues that the Plan does not reflect the true intent of *either* party to the contract and therefore should be reformed.

ALPA first argues that the application of the doctrine of scrivener's error is precluded by ERISA's statutory goal of ensuring that "every employee may, on examining the plan documents, determine exactly what his rights are under the plan." *International Union v. Murata Erie N. Am., Inc.,* 980 F.2d at 907 (quoting *Frank v. Colt Indus., Inc.,* 910 F.2d 90, 97 (3d Cir.1990)); *see also Cinelli v. Security Pacific Corp.,* 61 F.3d at 1445 ("the application of the principles of mistake would be inconsistent with ERISA's strong preference for the written terms of the plan and the goal of ERISA to ensure that an employee's rights and obligations can be readily ascertained from the plan documents . . ."); H.Conf.Rep. No. 93–1280, 93rd Cong., 2d Sess. at 297 (1974) ("A written plan is . . . required in order that every employee may, on examining the plan documents, determine exactly what his [or her] rights and obligations are under the plan"). Because the beneficiaries of the Plan have no way of knowing when the terms of a plan do not reflect the negotiators' intent, ALPA contends that the Court should not undermine the employees' reliance on the Plan's clear and unambiguous text.

 While ERISA's statutory goal of ensuring certainty is a relevant consideration in deciding when courts should equitably reform a plan, it does not prevent a court from exercising its equitable powers. Rather, in deciding whether to reform a plan in equity, the courts have considered ERISA's goals along with other equitable factors. When the scrivener's error is such that the employees could not have relied upon it, and indeed would receive a "windfall" if the plan were not reformed, courts have been more inclined to intervene and change the terms of the plan to reflect the parties' true intent. *See Cinelli v. Security Pacific Corp.,* 61 F.3d at 1445 (reformation permissible when "the error at issue was a windfall and would not mislead an employee as to benefits"); *International Union v. Murata Erie N. Am., Inc.,* 980 F.2d at 907 (reformation allowed when excess funds existed that neither side expected and one side would receive a windfall).

 The Court concludes that the facts of this case allow for the application of the doctrine of "scrivener's error." No pilot will have had relied upon the language of the Plan in hopes of receiving prospective disability benefits because no person plans to become disabled. While some pilots might have foregone private disability insurance because of the terms of the plan, no pilot could have reasonably relied on a calculation that could provide him or her with disability benefits $2500 per month *more* than the pilot would have received if still employed by Eastern. This is particulary true in light of the fact that the pilots were informed by Trump that they would receive a plan identical to the one they had at Eastern and because the literal language of the plan undeniably results in a windfall for the pilots. *See supra* at 6; Respess Decl. ¶¶ 6, 11. The Court therefore finds that it is within its equitable powers to reform the Plan.

 ALPA's second argument is that even if the Court has the power to reform the Plan, it may not do so in this instance because Shuttle has not demonstrated by clear and convincing evidence that there was in fact a *mutual* mistake—that is, that ALPA intended disability benefits to be calculated as Shuttle says it did. *See International Union v. Murata Erie N. Am. Inc.,* 980 F.2d at 908 (clear and convincing

standard of proof required to establish scrivener's error); *Isaac v. First Nat'l Bank of Md.,* 647 A.2d at 1163 (same). In support of this argument, ALPA presents the testimony and declaration of Captain Peter McGuirk, its principal negotiator with Trump, and the testimony of Elizabeth Koby, its attorney, both of whom assert that there was never any discussion of the means by which disability benefits would be calculated. *See* McGuirk Deposition at 49, 53, 106; McGuirk Decl. ¶¶ 18, 22; Deposition of Elizabeth Koby ("Koby Deposition") at 28, 47–48, 89, 103. ALPA also provides Ms. Koby's notes from the negotiations, which appear to emphasize that only the amount due under the *Trump* retirement plans would be subtracted from the disability benefits. *See* Koby Deposition, Exh. 17. Finally, ALPA contends that the statements and letters from Trump to Eastern employees are only indicative of Trump's intent, not ALPA's intent, and that ALPA did not understand Trump's offer of identical "terms and conditions" to mean that the pilots would necessarily receive identical "benefits."

At this juncture, ALPA has cast enough doubt about *its* intent in the 1989 negotiations to preclude reformation for scrivener's error or mutual mistake. While the Court does not necessarily credit ALPA's representation that it believed the terms of Section 5.7 could have effectuated Trump's actual intent (especially given Trump's numerous statements that it wanted to provide an identical plan), ALPA has presented sufficient evidence of its own intent to prevent the grant of summary judgment. *See, e.g.,* McGuirk Deposition at 22, 37, 53, 64; McGuirk Supp. Decl. ¶¶ 2–5. Thus, before the Court could reform the Plan under the doctrine of scrivener's error or mutual mistake, this case would have to be tried to sort out the genuine issues of material fact and Shuttle would have to prove its case at trial by clear and convincing evidence.

 The Court also has considered whether it may reform the Plan on the basis of Trump's *unilateral* mistake of fact. Adopting the approach of the Restatement (Second) of Contracts, the District of Columbia Court of Appeals has held that unilateral mistake is a valid defense to a contract claim and that a contract is voidable if "one party is reasonably mistaken about a material aspect of the contract and . . . the other party knew or should have known of that erroneous understanding" and if the mistaken party "does not bear the risk of the mistake." *Flippo Constr. Co. v. Mike Parks Diving Corp.,* 531 A.2d 263, 270–74 (D.C.1987) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 153, 154 (1981)), *see Sutton v. Banner Life Ins., Co.,* 686 A.2d 1045, 1051 (D.C.1996). While the District of Columbia courts have never addressed whether the doctrine of unilateral mistake also allows a court to reform a contract, the Restatement, on which the *Flippo* holding is based, allows reformation only in circumstances of mutual mistake of fact, not unilateral mistake. *See* RESTATEMENT (SECOND) OF CONTRACTS § 155 (1981) ("Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of *both* parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement . . .") (emphasis added).

Two judges of this Court also have held that reformation is an available remedy only when there has been a *mutual* mistake of fact. *See Mulligan v. Resolution Trust Corp.,* 903 F.Supp. 121, 124 (D.D.C. 1995) (Robertson, J.) ("A mistake of fact can be the basis for reformation of a contract, but the mistake must be mutual"); *Northwest Pipeline Corp. v. Helms,* 583 F.Supp. 37, 39 (D.D.C.1983) (Oberdorfer, J.) ("Reformation is appropriate only to conform the agreement to the intentions of the parties at the time they contracted. . . . Absent clearer evidence of a mutual intent of the parties . . ., reformation would be

inappropriate"). Finally, while a number of other circuits have allowed reformation of a contract for unilateral mistake, they have invoked the remedy only when the nonmistaken party has engaged in fraud or inequitable conduct. *See, e.g., Amwest Savings Ass'n v. Statewide Capital, Inc.,* 144 F.3d 885, 890 (5th Cir.1998) (applying Texas law); *Hanover Ins. Co. v. American Engineering Co.,* 105 F.3d 306, 311 (6th Cir.1997) (applying Kentucky law). There are no allegations of fraud in this case. The Court therefore concludes that it may not reform the Plan under the doctrine of unilateral mistake. This case will be scheduled for trial on the issue of whether the Plan should be reformed for a scrivener's error or mutual mistake of fact.

An Order consistent with this Opinion is entered this same day.

SO ORDERED.

### ORDER

Upon consideration of the parties' cross motions for summary judgment, the oppositions and the replies, and the arguments of counsel at the motions hearing, and for the reasons stated in the Opinion issued this same day, it is hereby

ORDERED that plaintiff's motion for summary judgment is DENIED; it is

FURTHER ORDERED that defendant's motion for summary judgment is DENIED; and it is

FURTHER ORDERED that a status conference is scheduled for August 3, 1999 at 9:30 a.m. to set pretrial and trial dates.

SO ORDERED.