Ora Lee WILLIAMS, Appellant,

v.

WALKER–THOMAS FURNITURE COMPANY, Appellee.

William THORNE et al., Appellants,

v.

WALKER–THOMAS FURNITURE COMPANY, Appellee.

Nos. 18604, 18605.

United States Court of Appeals District of Columbia Circuit.

Argued April 9, 1965.

Decided Aug. 11, 1965.

Mr. Pierre E. Dostert, Washington, D. C., counsel for appellants in No. 18,605, argued for all appellants.

Mr. R. R. Curry, Washington, D. C., for appellant in No. 18,604.

Mr. Harry Protas, Washington, D. C., for appellee.

Mr. Gerhard P. Van Arkel (appointed by this court), Washington, D. C., as *amicus curiae*.

Before BAZELON, Chief Judge, and DANAHER and WRIGHT, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

Appellee, Walker-Thomas Furniture Company, operates a retail furniture store in the District of Columbia. During the period from 1957 to 1962 each appellant in these cases purchased a number of household items from Walker-Thomas, for which payment was to be made in installments. The terms of each purchase were contained in a printed form contract which set forth the value of the purchased item and purported to lease the item to appellant for a stipulated monthly rent payment. The contract then provided, in substance, that title would remain in Walker-Thomas until the total of all the monthly payments made equaled the stated value of the item, at which time appellants could take title. In the event of a default in the payment of any monthly installment, Walker-Thomas could repossess the item.

The contract further provided that "the amount of each periodical installment payment to be made by [purchaser] to the Company under this present lease shall be inclusive of and not in addition to the amount of each installment payment to be made by [purchaser] under such prior leases, bills or accounts; *and all payments now and hereafter made by [purchaser] shall be credited pro rata on all outstanding leases, bills and accounts* due the Company by [purchaser] at the time each such payment is made." Emphasis added.) The effect of this rather obscure provision was to keep a balance due on every item purchased until the balance due on all items, whenever purchased, was liquidated. As a result, the debt incurred at the time of purchase of each item was secured by the right to repossess all the items previously purchased by the same purchaser, and each new item purchased automatically became subject to a security interest arising out of the previous dealings.

On May 12, 1962, appellant Thorne purchased an item described as a Daveno, three tables, and two lamps, having total stated value of $391.10. Shortly thereafter, he defaulted on his monthly payments and appellee sought to replevy all the items purchased since the first transaction in 1958. Similarly, on April 17, 1962, appellant Williams bought a stereo set of stated value of $514.95.[1] She too defaulted shortly thereafter, and appellee sought to replevy all the items purchased since December, 1957. The Court of General Sessions granted judgment for appellee. The District of Columbia Court of Appeals affirmed, and we granted appellants' motion for leave to appeal to this court.

Appellants' principal contention, rejected by both the trial and the appellate courts below, is that these contracts, or at least some of them, are unconscionable and, hence, not enforceable. In its opin-

---

1. At the time of this purchase her account showed a balance of $164 still owing from her prior purchases. The total of all the purchases made over the years in question came to $1,800. The total payments amounted to $1,400.

ion in Williams v. Walker-Thomas Furniture Company, 198 A.2d 914, 916 (1964), the District of Columbia Court of Appeals explained its rejection of this contention as follows:

"Appellant's second argument presents a more serious question. The record reveals that prior to the last purchase appellant had reduced the balance in her account to $164. The last purchase, a stereo set, raised the balance due to $678. Significantly, at the time of this and the preceding purchases, appellee was aware of appellant's financial position. The reverse side of the stereo contract listed the name of appellant's social worker and her $218 monthly stipend from the government. Nevertheless, with full knowledge that appellant had to feed, clothe and support both herself and seven children on this amount, appellee sold her a $514 stereo set.

"We cannot condemn too strongly appellee's conduct. It raises serious questions of sharp practice and irresponsible business dealings. A review of the legislation in the District of Columbia affecting retail sales and the pertinent decisions of the highest court in this jurisdiction disclose, however, no ground upon which this court can declare the contracts in question contrary to public policy. We note that were the Maryland Retail Installment Sales Act, Art. 83 §§ 128–153, or its equivalent, in force in the District of Columbia, we could grant appellant appropriate relief. We think Congress should consider corrective legislation to protect the public from such exploitive contracts as were utilized in the case at bar."

We do not agree that the court lacked the power to refuse enforcement to contracts found to be unconscionable. In other jurisdictions, it has been held as a matter of common law that unconscionable contracts are not enforceable.[2] While no decision of this court so holding has been found, the notion that an unconscionable bargain should not be given full enforcement is by no means novel. In Scott v. United States, 79 U.S. (12 Wall.) 443, 445, 20 L.Ed. 438 (1870), the Supreme Court stated:

"* * * If a contract be unreasonable and unconscionable, but not void for fraud, a court of law will give to the party who sues for its breach damages, not according to its letter, but only such as he is equitably entitled to. * * *"[3]

Since we have never adopted or rejected such a rule,[4] the question here presented is actually one of first impression.

 Congress has recently enacted the Uniform Commercial Code, which specifically provides that the court may refuse to enforce a contract which it finds to be unconscionable at the time it was made. 28 D.C.Code § 2–302 (Supp. IV 1965). The enactment of this section, which occurred subsequent to the contracts here in suit, does not mean that

2. Campbell Soup Co. v. Wentz, 3 Cir., 172 F.2d 80 (1948); Indianapolis Morris Plan Corporation v. Sparks, 132 Ind.App. 145, 172 N.E.2d 899 (1961); Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 84–96, 75 A.L.R.2d 1 (1960). Cf. 1 CORBIN, CONTRACTS § 128 (1963).

3. See Luing v. Peterson, 143 Minn. 6, 172 N.W. 692 (1919); Greer v. Tweed, N.Y. C.P., 13 Abb.Pr., N.S., 427 (1872); Schnell v. Nell, 17 Ind. 29 (1861); and see generally the discussion of the English authorities in Hume v. United States, 132 U.S. 406, 10 S.Ct. 134, 33 L.Ed. 393 (1889).

4. While some of the statements in the court's opinion in District of Columbia v. Harlan & Hollingsworth Co., 30 App.D.C. 270 (1908), may appear to reject the rule, in reaching its decision upholding the liquidated damages clause in that case the court considered the circumstances existing at the time the contract was made, see 30 App.D.C. at 279, and applied the usual rule on liquidated damages. See 5 CORBIN, CONTRACTS §§ 1054–1075 (1964); Note, 72 YALE L.J. 723, 746–755 (1963). Compare Jaeger v. O'Donoghue, 57 App.D.C. 191, 18 F.2d 1013 (1927).

the common law of the District of Columbia was otherwise at the time of enactment, nor does it preclude the court from adopting a similar rule in the exercise of its powers to develop the common law for the District of Columbia. In fact, in view of the absence of prior authority on the point, we consider the congressional adoption of § 2–302 persuasive authority for following the rationale of the cases from which the section is explicitly derived.[5] Accordingly, we hold that where the element of unconscionability is present at the time a contract is made, the contract should not be enforced.

Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.[6] Whether a meaningful choice is present in a particular case can only be determined by consideration of all the circumstances surrounding the transaction. In many cases the meaningfulness of the choice is negated by a gross inequality of bargaining power.[7] The manner in which the contract was entered is also relevant to this consideration. Did each party to the contract, considering his obvious education or lack of it, have a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print and minimized by deceptive sales practices? Ordinarily, one who signs an agreement without full knowledge of its terms might be held to assume the risk that he has entered a one-sided bargain.[8] But when a party of little bargaining power, and hence little real choice, signs a commercially unreasonable contract with little or no knowledge of its terms, it is hardly likely that his consent, or even an objective manifestation of his consent, was ever given to all the terms. In such a case the usual rule that the terms of the

5. See Comment, § 2–302, Uniform Commercial Code (1962). Compare *Note*, 45 Va.L.Rev. 583, 590 (1959), where it is predicted that the rule of § 2–302 will be followed by analogy in cases which involve contracts not specifically covered by the section. *Cf.* 1 State of New York Law Revision Commission, Report and Record of Hearings on the Uniform Commercial Code 108–110 (1954) (remarks of Professor Llewellyn).

6. See Henningsen v. Bloomfield Motors, Inc., *supra* Note 2; Campbell Soup Co. v. Wentz, *supra* Note 2.

7. See Henningsen v. Bloomfield Motors, Inc., *supra* Note 2, 161 A.2d at 86, and authorities there cited. Inquiry into the relative bargaining power of the two parties is not an inquiry wholly divorced from the general question of unconscionability, since a one-sided bargain is itself evidence of the inequality of the bargaining parties. This fact was vaguely recognized in the common law doctrine of intrinsic fraud, that is, fraud which can be presumed from the grossly unfair nature of the terms of the contract. See the oft-quoted statement of Lord Hardwicke in Earl of Chesterfield v. Janssen, 28 Eng. Rep. 82, 100 (1751):
" * * * [Fraud] may be apparent from the intrinsic nature and subject of the bargain itself; such as no man in his senses and not under delusion would make * * *."
And *cf.* Hume v. United States, *supra* Note 3, 132 U.S. at 413, 10 S.Ct. at 137, where the Court characterized the English cases as "cases in which one party took advantage of the other's ignorance of arithmetic to impose upon him, and the fraud was apparent from the face of the contracts." See also Greer v. Tweed, *supra* Note 3.

8. See Restatement, Contracts § 70 (1932); *Note*, 63 Harv.L.Rev. 494 (1950). See also Daley v. People's Building, Loan & Savings Ass'n, 178 Mass. 13, 59 N.E. 452, 453 (1901), in which Mr. Justice Holmes, while sitting on the Supreme Judicial Court of Massachusetts, made this observation:
" * * * Courts are less and less disposed to interfere with parties making such contracts as they choose, so long as they interfere with no one's welfare but their own. * * * It will be understood that we are speaking of parties standing in an equal position where neither has any oppressive advantage or power * * *."

agreement are not to be questioned[9] should be abandoned and the court should consider whether the terms of the contract are so unfair that enforcement should be withheld.[10]

In determining reasonableness or fairness, the primary concern must be with the terms of the contract considered in light of the circumstances existing when the contract was made. The test is not simple, nor can it be mechanically applied. The terms are to be considered "in the light of the general commercial background and the commercial needs of the particular trade or case."[11] Corbin suggests the test as being whether the terms are "so extreme as to appear unconscionable according to the mores and business practices of the time and place." 1 CORBIN, *op. cit. supra* Note 2.[12] We think this formulation correctly states the test to be applied in those cases where no meaningful choice was exercised upon entering the contract.

Because the trial court and the appellate court did not feel that enforcement could be refused, no findings were made on the possible unconscionability of the contracts in these cases. Since the record is not sufficient for our deciding the issue as a matter of law, the cases must be remanded to the trial court for further proceedings.

So ordered.

DANAHER, Circuit Judge (dissenting):

The District of Columbia Court of Appeals obviously was as unhappy about the situation here presented as any of us can possibly be. Its opinion in the *Williams* case, quoted in the majority text, concludes: "We think Congress should consider corrective legislation to protect the public from such exploitive contracts as were utilized in the case at bar."

My view is thus summed up by an able court which made no finding that there had actually been sharp practice. Rather the appellant seems to have known precisely where she stood.

There are many aspects of public policy here involved. What is a luxury to some may seem an outright necessity to others. Is public oversight to be required of the expenditures of relief funds? A washing machine, e. g., in the hands of a relief client might become a fruitful source of income. Many relief clients may well need credit, and certain business establishments will take long chances on the sale of items, expecting their pricing policies will afford a degree of protection commensurate with the risk. Perhaps a remedy when necessary will be found within the provisions of the "Loan Shark" law, D.C.CODE §§ 26–601 *et seq.* (1961).

I mention such matters only to emphasize the desirability of a cautious approach to any such problem, particularly since the law for so long has allowed parties such great latitude in making their own contracts. I dare say there must annually be thousands upon thousands of installment credit transactions in this jurisdiction, and one can only speculate

---

9. This rule has never been without exception. In cases involving merely the transfer of unequal amounts of the same commodity, the courts have held the bargain unenforceable for the reason that "in such a case, it is clear, that the law cannot indulge in the presumption of equivalence between the consideration and the promise." 1 WILLISTON, CONTRACTS § 115 (3d ed. 1957).

10. See the general discussion of "Boiler-Plate Agreements" in LLEWELLYN, THE COMMON LAW TRADITION 362–371 (1960).

11. Comment, Uniform Commercial Code § 2–307.

12. See Henningsen v. Bloomfield Motors, Inc., *supra* Note 2; Mandel v. Liebman, 303 N.Y. 88, 100 N.E.2d 149 (1951). The traditional test as stated in Greer v. Tweed, *supra* Note 3, 13 Abb.Pr.,N.S., at 429, is "such as no man in his senses and not under delusion would make on the one hand, and as no honest or fair man would accept, on the other."

as to the effect the decision in these cases will have.[1]

I join the District of Columbia Court of Appeals in its disposition of the issues.

---

1. However the provision ultimately may be applied or in what circumstances, D.C. Code § 28-2-301 (Supp. IV, 1965) did not become effective until January 1, 1965.