DEVELOPMENT BANK OF AMERICAN SAMOA, Plaintiff

v.

PALE ILALIO and TOA'I ILALIO, Defendants

High Court of American Samoa
Trial Division

CA No. 34-87

July 2, 1987

Before REES, Chief Justice, AFUOLA, Associate Judge, and TUIAFONO, Associate Judge.

Counsel: For Plaintiff, Robert Dennison
         Pale and Toa'i Ilalio pro se

Plaintiff Development Bank sues to collect an overdue balance of $10,004.05 on a promissory note. With interest, costs, and attorney fees the amount of the requested judgment is $14,355.51. Defendants claim that their signatures on the note were obtained by fraud and that the much smaller obligation they actually incurred to the Bank has been discharged.

The undisputed facts are that the debt was originally incurred by Mr. Ilalio's half-brother in connection with the purchase of a pickup truck for

-2-

business purposes. It was the understanding of the parties that the note was secured by the truck. Although the Bank does not have copies of the documents by which this security was effected, counsel for the Bank has informed the Court that such documentation would have consisted either of "being the 'legal owner' on the certificate of title" or of a written chattel mortgage agreement.

In 1981 or early 1982 the half-brother left the Territory. The truck was left in possession of Mr. Ilalio, who also used it for business purposes. He soon began receiving telephone calls from Bank officials who stated that they intended to repossess the truck unless he agreed to accept liability for his half-brother's debt. According to Mr. Ilalio, he repeatedly informed the officials that he would agree to be liable for the fair value of the truck but not for any greater amount. Finally, on June 1, 1982, he was warned that if he and his wife did not go down to the Development Bank immediately to sign the papers, it would be sold to one of the "other customers" who were "lined up waiting to buy it."

Mr. and Mrs. Ilalio did go to the Bank and sign the papers. Mr. Ilalio testified, however, that the promissory note was entirely blank when it was presented for his signature, and that on an accompanying "application" the line indicating the amount of the loan was left blank. He testified that he was told only that his monthly payments would be $165, and that the Bank would have to figure out the total amount of the loan and fill it in later. He also testified that he believed he was agreeing only to pay the Bank for the value of the truck.

A few months later, Mr. and Mrs. Ilalio themselves left the Territory, having paid $580 on the note. The truck was left with another relative. In June of 1983 two men from the bank came to this relative's house and took the truck. It was sold, apparently by private sale, for $6000.

In 1986 Mr. and Mrs. Ilalio returned to American Samoa. They were soon contacted by Development Bank officials who told them they still owed over $10,000 in principal plus accrued interest on the promissory note. Mr. and Mrs. Ilalio then went to the Development Bank and signed an agreement acknowledging this debt and agreeing to pay $200 per month on it. They made three

payments and then stopped, giving rise to this suit.

The defendants, who are not represented by counsel, make arguments that are similar to several of the traditional grounds on which courts have sometimes held contracts unenforceable:

1) _Fraud or Mutual Mistake_. Defendants say that they only agreed to obligate themselves for the value of the truck, which was about $6000, and that the amount of $15,164.16 was filled in by Development Bank officials without their knowledge or consent. If they are telling the truth the contract is voidable for fraud or mutual mistake, depending on whether the officials knew of the defendants' understanding.[1]

Although we would not usually be inclined to believe that anyone would sign a blank promissory note, in this case it may well be true. Mr. Ilalio did not impress us as an untruthful witness. The documentary evidence submitted by the Bank is not inconsistent with his story: on the "application" the amount of the loan and a few other items seem to have been written by a different hand and with a different pen than the items containing personal information on Mr. Ilalio. The Bank presented no witness to the transaction, probably because neither of the Development Bank officials with whom the defendants dealt is currently employed by the Bank, both of them having gone to jail for activities similar to those of which the Ilalios accuse them. _See_ _American Samoa Government_ v. _To'oto'o_, 2 A.S.R.2d 61 (1985) (larceny, fraud, embezzlement, making a false entry in an official record); _American Samoa Government v. Suisala_, CR Nos. 4-85 and 5-85 (eleven counts of embezzlement, one count of tampering with a witness). _See also_ _Filioiali'i v. Adams_, CA No. 124-85, _affirmed_, 3 A.S.R.2d 105 (1986), documenting an attempt by these same officials, acting on behalf of the Bank, to "sell" and take a "mortgage" on property that belonged to someone else. But the strongest

---

[1] Parol evidence is admissible to show that an agreement reached by the parties was improperly reduced to writing because of fraud or mutual mistake, or that there was no agreement at all for one of these reasons. _See_ 2 Corbin on Contracts § 580 at 431-40 (rev. ed. 1960), and cases cited therein.

-4-

argument for the credibility of Mr. Ilalio's story is the implausibility of the alternative hypothesis: that he willingly agreed to buy a $6000 truck (not the truck itself, actually, but the use of it for as long as he kept making payments and his half-brother did not return) for $15,000 plus several thousand dollars in interest.

    2) Unconscionability. We need not decide which of these two improbable events took place, however, because in either case the agreement was unenforceable. If the Bank actually did sell the Ilalios the conditional use of a truck (or even the whole truck) for over twice its market value, it was a contract "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." Hume v. United States, 132 U.S. 406 (1889), quoting Earl of Chesterfield v. Jannsen, 28 Eng. Rep. 82, 100 (Ch. 1750). According to the common law of contracts, which applies in American Samoa except when it conflicts with territorial statutes or is unsuitable to local conditions, such a contract is unconscionable and should not be enforced.[2]

    This is not to say that a party can be relieved of his contractual obligations simply because he made a bad bargain. Although courts have occasionally held contracts to be unconscionable on the sole ground that there was a gross disparity in value between the two considerations exchanged, this tends to substitute the court for the contracting parties as the judge of value. The essence of the right to contract is the freedom of each person to decide what he is

    [2] See A.S.C.A. § 1.0201 (reception of common law in American Samoa); Tung v. Ah Sam, 4 A.S.R. 764 (1971) (in construing the common law, court should ordinarily follow the Restatement of the Law); Restatement of Contracts 2d §208 (1981) ("If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result."). See also Mauga Family v. Mauga, 1 A.S.R. 587 (1938) (principles of equity are part of the law of American Samoa).

willing to pay for the things he wants, even if his value choices differ from those made by most other people.

And yet the idea of "fair" or "market" value is not altogether irrelevant to the determination of whether a contract should be enforced. When a person pays too much more for a thing than he could have paid by walking down the street to another place of business, it raises doubts about whether the transaction was free from fraud and coercion. By the same token, even the most serious questions about the fairness of the bargaining process become far less serious if the considerations given and received by the weaker party seem to be about what they would have been if the process had been above board. (The typical person who did business with the corrupt former management of the Development Bank, for instance, would have received $15,000 in exchange for his signature on a promise to repay $15,000 plus interest. Unlike the defendants in this case, who are being sued on a "loan" that was not a loan at all, such a person would have a difficult time proving that he was damaged by irregularities in the bargaining process.)

Accordingly, most courts have held that a contract is unenforceable only when there is convincing evidence both of "substantive" and of "procedural" unconscionability:

> [W]hen a party of little bargaining power, and hence little real choice, signs a commercially unreasonable contract with little or no knowledge of its terms, it is hardly likely that his consent, or even an objective manifestation of his consent, was ever given to all the terms. In such a case the usual rule that the terms of the contract are not to be questioned should be abandoned and the court should consider whether the terms of the contract are so unfair that enforcement should be withheld.

Williams v. Walker-Thomas Furniture Co., 350 F.2d 445, 449 (D.C. Cir. 1965) (footnotes omitted).

In this case, assuming Mr. and Mrs. Ilalio actually did sign a document obligating them to pay $15,000 for the use of the truck, it was a contract of adhesion presented to them by a Bank official with vastly superior bargaining power and business

-6-

sophistication (and with a certified penchant for dishonesty, sharp practice, and self-dealing) along with a threat that an implement of their livelihood would be "sold" to "another customer" if they did not sign immediately. Assuming that the Bank had a legal right to repossess and sell the truck, a threat to do so would generally not render the resulting contract void for duress. It did, however, contribute to the "absence of meaningful choice" which requires that the court inquire into the substantive fairness of the contract before enforcing it against the defendants. Williams v. Walker-Thomas Furniture Co., supra, 350 F.2d at 449.

The Bank soon did repossess the truck, which was the only thing it ever gave the Ilalios. It also has received about $1200 of the defendants' money, which is enough to compensate it for their use of the truck during the time between the contract and the repossession. The Bank demands that we order the Ilalios to pay another $10,000 plus interest; this we decline to do.

3) Accord and Satisfaction. The previous discussion assumes that the truck was worth about $6000. This was the uncontroverted testimony of Mr. Ilalio, who said that at the time of this transaction brand new pickup trucks were selling for $7000 or $8000. Nothing else is known about the truck except that it was a 1970s model and that it was sold by the bank in 1982 for $6000; the bank no longer has any records concerning the transaction or the truck. Accordingly, we find as a fact that it was worth between $6000 and $7000. If, however, the truck had actually been worth an amount close to the $15,000 the Ilalios allegedly agreed to pay for it,[3] it is not at all clear that the Bank had the right to sell it for far less than its market value and then recover the balance of the loan amount from the defendants.

_____

[3] No evidence has been presented concerning the loan originally incurred by the half-brother. We do not know, therefore, how a truck that apparently cost no more than $8000 when it was new came to be secured by a loan with a balance of $15,000 by the time the Ilalios were required to assume it. This could have been the product of several years' accumulation of interest, or perhaps of consolidation of the truck loan with other debts owed by the half-brother to the Bank.

-7-

The heady days of creditor self-help unfettered by due process of law are gone now, if indeed they ever existed. At common law á mortgagee had no right to repossess without resort to judicial foreclosure unless there was a clear and explicit provision in the contract giving him the right to do so. There is no such clause in the chattel mortgage form submitted by the Bank, which may or may not have been the form signed by Mr. Ilalio's half-brother. Nor would such a provision be clearly implied by the Bank's designation as "legal owner" on the title to the truck, where the Bank led the buyer to understand that the designation was intended as a security device rather than an actual statement of who owns the vehicle. (Vagueness and ambiguity in security devices, as in other contracts, are resolved against the drafter.)

In any case there is always an obligation to exercise good faith in the execution of contracts. In the case of secured transactions one incident of this obligation is that a creditor who seizes and sells a thing to satisfy his debt must exercise due diligence to secure a fair price for it. This obligation has been codified by statute in all fifty states; where it does not require a judicial foreclosure or an advertised public sale it at least requires that the sale be conducted in accordance with commercially reasonable practices and that there be notice to the mortgagor. See, e.g., Uniform Commercial Code §§ 9-504-07. Creditors who repossess things and dispose of them without such indicia of good faith have been held to have accepted them in full payment of the whole debt, either under the principle of accord and satisfaction (as the defendants argue in this case) or because in the absence of circumstances ensuring an accurate appraisal of its value the thing is presumed to be worth the amount of the debt. If we thought the truck had been worth $15,000 or anything close to it in 1981, we would be strongly inclined to believe that its unadvertised sale for $6000 in 1982 was a breach of the obligation of good faith which relieved the defendants of any obligation to pay the balance of the amount due on the note.[4]

_____

4 We understand that the dubious circumstances that gave rise to this case are not the fault of the current management of the Development Bank. Against innocent third

Accordingly, the action is dismissed.

---

parties, however, the Bank has only those rights that were legitimately acquired at the time its contracts were made. It did not acquire any new rights simply by purging the officials whose misdealings tainted some of its contracts. This does not, of course, prevent the Bank from recovering against people who dealt with the former management but who are not shown to have been victims of their improper activities. Indeed, in cases where third parties are shown to have colluded with the former management to obtain contracts grossly disadvantageous to the Bank, the new management can presumably recover the ill-gotten gains.

One of the transactions involved in this case did take place after the new management had taken over. This was the occasion on which the defendants, having returned to American Samoa, signed a document styled an "agreement," acknowledging the debt and promising to resume monthly payments. Asked by the Court why he signed this document if he did not really believe he owed the money, Mr. Ilalio explained that he and his wife had just returned to the island, were attempting to re-establish themselves, and did not want trouble. This explanation would not be good enough if they had actually owed the Bank any money to begin with and if the "agreement" were offered only as evidence that the statute of limitations had been waived or for some other incidental purpose. In fact, however, there was no consideration for this "agreement" and it was therefore not legally binding on the Ilalios.