OPINION
Defendant-appellant, Evelyn L. Leach, appeals the judgment of the Franklin County Court of Common Pleas granting summary judgment to plaintiff-appellee, Beneficial Mortgage Co. of Ohio ("Beneficial"), on Beneficial's complaint seeking judgment on a credit line account agreement with defendant and foreclosure of a mortgage securing the agreement.
On July 20, 1999, Beneficial filed a complaint against defendant in the Franklin County Court of Common Pleas alleging that on or about June 22, 1998, defendant executed and delivered to Beneficial a "credit line account agreement" in the amount of $125,600. A copy of the agreement, attached to the complaint and dated June 22, 1998, contained a signature purporting to be that of defendant. At that time, defendant executed and delivered to Beneficial a certain mortgage deed that secures the agreement. Contending defendant failed to pay the monthly installments of principal and interest due on the agreement, Beneficial, as the holder of the agreement, elected to declare all indebtedness on the agreement to be immediately due and payable. By its complaint, Beneficial sought judgment on the unpaid indebtedness arising from the agreement, as well as foreclosure on the mortgage. On August 24, 1999, the clerk of courts received from defendant a letter indicating that defendant disputed the action. Defendant was not represented by counsel at that time.
On December 8, 1999, Beneficial moved for summary judgment. In support, Beneficial submitted an affidavit from Beneficial's "foreclosure specialist," Matt Ashcraft, who averred that defendant was in default on the agreement and that the principal balance due was $140, 893.62, plus interest thereon at 13.31 percent from June 7, 1999.
Recognizing the letter filed on August 24, 1999 as defendant's pro se answer to the complaint, the trial court permitted defendant, through her newly-acquired counsel, to file an amended answer and counterclaim. The amended answer generally denied that defendant executed and delivered to Beneficial the document attached to the complaint, but admitted that Beneficial is the holder of, and is in possession of, the agreement.
The amended answer also set forth several defenses to the action. Apart from a general denial, the answer asserted (1) defendant was fraudulently induced to sign the agreement and mortgage deed, (2) the agreement and mortgage deed were backdated by Beneficial to deprive defendant of her right to rescind within three business days, (3) defendant signed the agreement and mortgage under duress, and (4) Beneficial's conduct toward defendant was unconscionable.
For her counterclaim, defendant alleged she originally financed an above-ground swimming pool through Beneficial in July 1995 for approximately $6,000, but following the death of her husband she became "quite ill and depressed such that she eventually became disabled." Defendant alleges that she fell behind on her pool payments "[a]s the result of her medical difficulties." According to the counterclaim, Beneficial threatened legal action, when it knew or should have known that defendant was "in a particularly vulnerable condition," to convince defendant that she had no alternative but to refinance her residence along with the pool through Beneficial; she was assured that Beneficial would get her a lower interest rate. According to the counterclaim, when Beneficial presented the agreement and mortgage to defendant, the documents were backdated more than three days and the interest rate of fourteen percent was in excess of the rates defendant was paying on her existing mortgage and swimming pool loan. "Reluctantly, [defendant] signed the credit line agreement and mortgage." (Counterclaim, paragraph 2.)
The counterclaim sets forth four causes of action: (1) a violation of the Federal Truth and Lending Act ("TILA"), (2) fraud/misrepresentation in knowingly making misrepresentations to induce defendant to accept the agreement and mortgage, (3) intentional infliction of emotional distress, and (4) negligent infliction of emotional distress.
The parties pursued discovery. Beneficial's interrogatory No. 6 asked defendant to "[i]dentify with particularity all false representations you claim Beneficial made to you * * *." In response, defendant presented her recollection of the loan closing at Beneficial's offices which defendant asserts occurred on June 25, 1998. Defendant's answer to interrogatory No. 6 states in part:
 She [a Beneficial employee] went through the papers with me and showed me where I had to sign. (I was shaky and crying some and couldn't read the papers too well). On one page, I had to insert the date with my signature. I asked her what I was supposed to do there because it was the 25th, not June 22nd, as all the other papers were reflecting. She looked at the papers and told me it had to be the 22nd, so I did as she instructed.
 After all the papers were signed by me and her, she left to get them notarized and make copies for me. I didn't see the lady who notarized them because we were meeting in a work station and the lady that signed must have been in the outer office.
I signed the check and took my papers and left. * * *
On October 12, 2000, Beneficial deposed defendant. When Beneficial asked defendant to identify the credit line account agreement at issue, defendant denied having ever seen the document and repeatedly denied signing the agreement. However, defendant admitted signing the mortgage deed.
Following full briefing on both summary judgment motions, defendant, on January 23, 2001, moved for a court order requiring Beneficial to permit inspection of the originals of the loan documents by defendant's "potential expert witness." On February 2, 2001, the trial court granted defendant's motion and ordered Beneficial to produce the originals of the loan documents for inspection by defendant and her "designated expert" by February 9, 2001.
On February 23, 2001, the trial court sustained Beneficial's motion for summary judgment on defendant's counterclaims, but overruled Beneficial's motion for summary judgment on its complaint. In its written decision, the trial court found defendant's four defenses were unpersuasive. However, the trial court concluded the record presented a genuine issue of material fact as to whether Beneficial had violated the TILA notice requirements, thereby preserving defendant's right to rescind the transaction.
While the trial court overruled Beneficial's motion for summary judgment on its complaint, it found it appropriate to condition any potential right of defendant to rescission on her first tendering payment to Beneficial of the funds it disbursed on her behalf in connection with the refinancing transaction. To that end, the trial court ordered that defendant deposit the sum of $125,600 with the Franklin County Clerk of Courts on or before March 20, 2001, with the caveat that should defendant fail to deposit the sum with the clerk of courts by March 20, 2001, the court would sua sponte reconsider Beneficial's motion for summary judgment on its complaint and grant it.
On March 22, 2001, the trial court filed a written decision explaining that defendant had failed to deposit the funds with the clerk of courts and thus had failed to demonstrate her ability to tender payment to Beneficial upon a rescission. Accordingly, the trial court found defendant's TILA defense had been rendered moot, vacated that portion of its February 23, 2001 decision that overruled Beneficial's motion for summary judgment on its complaint, and sustained the motion in its entirety.
On April 12, 2001, Beneficial moved the trial court for a judgment decree in foreclosure, and on April 27, 2001, the trial court filed its judgment decree (1) entering judgment in favor of Beneficial and against defendant on the "Note" in the amount of $140,893.62, plus interest and late charges, and (2) foreclosing the mortgage. On the same day, the trial court also filed a "Journal Entry" stating that Beneficial's motion for summary judgment on its complaint and Beneficial's motion for summary judgment on defendant's counterclaims were sustained.
Defendant appeals, but does not set forth assignments of error. Instead, pages one through four of her corrected brief state in part:
1. DECISION RENDERED FEBRUARY 22, 2001
 2. Duress, page 6, para. 3 `Here, Ms. Leach claims that Beneficial threatened to foreclose on a $6,000 swimming pool'
 The foregoing statement by the court is inaccurate and was not the `threat' made by Guy Jones, Beneficial Mortgage, to Ms. Leach. Had this been the case, Ms. Leach would have gladly let the pool be repossessed[,] where the Judge gleaned this information about foreclosure of the swimming pool is beyond Ms. Leach. Nowhere does a statement of this nature appear, to the best of Ms. Leach's knowledge.
 The court rendered a decision in favor of Beneficial based on this inaccuracy, rather than based on fact.
 3. Unconscionability, page 10, para. 1 `Thus it appears that her total monthly payments increased slightly'. This statement/deducement by the court is totally inaccurate. Even simple mathematics, had they been applied, would have made it obvious the difference in the mortgage and pool payments from previous to new were much greater. The Court is in error in its math and its decision.
4. VIOLATION OF THE TILA 3-DAY RIGHT TO RESCIND
 Page 13 whereby judge ordered Ms. Leach to deposit $125,600 with the court. The judge erred in the amount ordered to be posted by Ms. Leach with the Court.
 DECISION AND ENTRY OVERRULING DEFENDANT'S MAR. 13, 2001 REQUEST FOR RECONSIDERATION AND MAY 11, 2001 FILING FOR NEW TRIAL
 The Court is in error in Overruling both of the foregoing filings. The filings were made within the time frames set forth for doing such.
 Ms. Leach feels the rulings are in error due to the fact that the REQUEST FOR RECONSIDERATION contains substantial information/documents that prove her case. However, for reasons unknown to Ms. Leach, the Judge ignored all the evidence, in favor of Beneficial Mortgage.
 Further, by doing so, the judge created a situation whereby the employees involved in forging Ms. Leach's name can continue to do so without any concern about such wrongdoing.
 The court must reverse the ruling and see that these people are brought to justice for such action.
 The Court should have given full consideration to the FILING FOR NEW TRIAL. In denying this motion, the judge suppressed all the evidence in the REQUEST FOR RECONSIDERATION, as this filing had been made a part of the FILING FOR NEW TRIAL due to a non-response boy [sic] the judge after the REQUEST FOR RECONSIDERATION WAS FILED.
JUDGMENT DECREE IN FORECLOSURE
April 26, 2001 decision, page 1
The judge refers to `a certain promissory note'.
 This document should be exculpatory evidence and Beneficial should be ordered to produce this document. Such a document has never surfaced and was not ever made a part of this case by Beneficial. Defendant Leach has not ever seen such a document. If, indeed, such document exists, this document must be ordered tested by a professional forensic institute for authenticity. If such a document exists and contains a `signature of Evelyn L. Leach', this document has been forged. The judge was in great error in ruling in favor of a document that has never been presented and may well be non-existent.
In its brief, Beneficial suggests defendant's assignments of error be construed as follows:
 1. Whether the trial court correctly entered summary judgment despite Leach's assertion that she did not sign the Credit Line Account Agreement (Appellant's Assignment of Error no. 1)?
 2. Whether the trial court correctly entered summary judgment on Leach's defense of duress (Appellant's Assignment of Error no. 2)?
 3. Whether the trial court correctly entered summary judgment on Leach's defense of unconscionability (Appellant's Assignment of Error no. 3)?
 4. Whether the trial court correctly ordered Leach to deposit with the court an amount equal to the amount she borrowed from Beneficial in order to preserve her TILA claim and correctly entered summary judgment on Leach's TILA claim when she did not deposit any funds with the court (Appellant's Assignment of Error no. 4)?
Given the difficulty in gleaning defendant's assignments of error from pages one through four of her corrected brief, we will address defendant's assignments of error as Beneficial has framed them, as they may be viewed as fair statements of some of the issues defendant raises on appeal. However, defendant's corrected brief attempts to present two additional assignments of error, which we refer to as defendant's fifth and sixth assignments of error:
 5. Whether the trial court erred in overruling defendant's March 13, 2001 Request for Reconsideration and her May 11, 2001 "Filing for New Trial."
 6. Whether the trial court erred in its judgment decree in foreclosure when it refers to a "certain promissory Note."
Summary judgment is appropriate when the movant demonstrates: (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, said party being entitled to have the evidence construed most strongly in his favor. Turner v. Turner (1993), 67 Ohio St.3d 337, 339-340; Bostic v. Connor (1988),37 Ohio St.3d 144, 146; Harless v. Willis Day Warehousing Co. (1978),54 Ohio St.2d 64, 66. The moving party bears the burden of proving no genuine issue of material fact exists. Mitseff v. Wheeler (1988),38 Ohio St.3d 112, 115. When reviewing a summary judgment, we apply the same standard as employed by the trial court. Ruscilli v. Ruscilli (1993), 90 Ohio App.3d 753, 755.
The first assignment of error asserts the trial court incorrectly entered summary judgment despite defendant's assertion that she did not sign the credit line account agreement.
Contrary to defendant's contentions, in her counterclaims defendant affirmatively stated she had reluctantly signed the agreement. She cannot create an issue of fact by contradicting herself. See, e.g., Pain Enterprises, Inc. v. Wessling (1995), Hamilton App. No. C-930888; Kollmorgan v. Raghavan (2000), Mahoning App. No. 98-CA-123. Moreover, to the extent the trial court allowed her the latitude of challenging the signature by expert testimony, the expert's opinion does not support defendant's contentions. Defendant's first assignment of error is overruled.
The second assignment of error contends the trial court erred by entering summary judgment on defendant's defense of duress. In her memorandum contra Beneficial's motions for summary judgment, defendant explained her duress defense as follows:
 * * * Leach signed the mortgage only after Jones, as representative of Plaintiff threatened her. Although his threats were admittedly vague, given Leach's mental state at the time and that Plaintiff's representatives were aware of Leach's history of depression and physical disability, reasonable minds could certainly conclude that the threats were legally sufficient to constitute duress. * * * Reasonable jurors could fairly conclude that to threaten Leach with the loss of her home given her mental and physical condition, known to Plaintiff, constituted duress.
In support of her duress defense, defendant noted that following her husband's death from an illness in January 1994, her adult children pressured her into purchasing an above-ground swimming pool. Defendant financed the pool by obtaining a $6,000 loan from Beneficial. Her son, then age twenty-four, pledged some personal property as collateral. Defendant herself put up no collateral. Her son agreed to help defendant with the payments but actually only helped make one payment. In 1998, defendant fell behind on the pool loan payments. Consequently, defendant talked to several Beneficial representatives about the matter, including Guy Jones.
According to defendant's deposition testimony, Jones called defendant and told her she had to do something about getting the pool loan paid. Jones suggested that defendant refinance her house. After Jones scheduled an appraisal, the loan was approved. When Jones told defendant what the monthly payments would be, defendant indicated she could not afford it. Jones then responded that unless defendant refinanced her house, Beneficial "will have to take other action." Jones also assured defendant that if she got behind on her payments, Beneficial would "work with you instead of foreclosing." Defendant had informed Jones that she had been diagnosed with severe depression and diabetes prior to refinancing with Beneficial. She testified that she was upset and crying when she signed the mortgage and the related papers.
The law of duress as a basis for avoiding a contract has evolved to encompass not only physical compulsion but economic compulsion as well. Blodgett v. Blodgett (1990), 49 Ohio St.3d 243, 246. Economic duress may be shown where the person claiming duress was subjected to improper threats that deprive the person of any reasonable alternative but to assent to the terms of the person making the threat. Maust v. Bank One Columbus, N.A. (1992), 83 Ohio App.3d 103, 108. Generally, a threat to do what one is legally entitled to do is not improper. Taking advantage of another's financial difficulty also does not constitute duress. Rather, the person claiming duress must show that the person making the threats caused or contributed to the alleged financial straits. Id. at 108-109.
In its decision of February 23, 2001, the trial court wrote:
 Here, Ms. Leach claims that Beneficial threatened to foreclose on a $6,000 swimming pool loan it had previously made to her unless she agreed to refinance. It is not disputed that Ms. Leach was behind in payments on that loan and that Beneficial had a legal right to foreclose if it chose to do so. Nor does Ms. Leach allege that Beneficial caused or contributed to her then-existing financial condition. On the evidence presented, the Court finds that a reasonable finder of fact could not find in Ms. Leach's favor. Consequently, the defense of duress is unsustainable.
In her corrected brief filed in this action, defendant asserts the trial court improperly stated: "* * * Leach claims that Beneficial threatened to foreclose on a $6000 swimming pool." According to defendant, the statement is inaccurate and is not the alleged threat Guy Jones made. According to defendant, she "would have gladly let the pool be repossessed."
Contrary to defendant's contention, defendant made it clear in her deposition that Jones' threat to take unspecified legal action on the swimming pool loan induced her to refinance through Beneficial. Moreover, the trial court did not state Jones threatened to repossess the pool. The trial court correctly understood defendant was alleging a threat from Beneficial to take unspecified legal action on the swimming pool loan. Accordingly, we overrule defendant's second assignment of error.
The third assignment of error asserts the trial court erred by entering summary judgment on defendant's defense of unconscionability. Absent unconscionability, Ohio courts have held the concept of freedom of contract to be fundamental to our society. Dorsey v. Contemporary Obstetrics Gynecology, Inc. (1996), 113 Ohio App.3d 75, 80. Unconscionability has been defined as an absence of meaningful choice on the part of one of the parties to a contract, combined with contract terms that are unreasonably favorable to the other party. Orlett v. Suburban Propane (1989), 54 Ohio App.3d 127, 129, relying on Williams v. Walker-Thomas Furniture Co. (C.A.D.C. 1965), 350 F.2d 445, 449. The purpose of the doctrine of unconscionability is to prevent oppression and unfair surprise. J. Calamari J. Perillo, Contracts (3 Ed. 1987), 406, Section 9-40.
Unconscionability is a question of law to be decided by the court. Jeffrey Mining Prod., L.P. v. Left Fork Mining Co. (2001),143 Ohio App.3d 708, 718. The unconscionability doctrine consists of two prongs: "(1) substantive unconscionability, i.e., unfair and unreasonable contract terms, and (2) procedural unconscionability, i.e., individualized circumstances surrounding parties to a contract such that no voluntary meeting of the minds was possible." Dorsey, supra, at 80. A certain "quantum" of both substantive and procedural unconscionability must be present to find a contract unconscionable. Collins v. Click Camera Video, Inc. (1993), 86 Ohio App.3d 826, 834.
"`As applied to real estate mortgages, the doctrine of unconscionability draws heavily on its counterpart in the Uniform Commercial Code which, although formally limited to transactions involving personal property, furnishes a useful guide for real property transactions.'" Family Fin. Serv., Inc. v. Spencer (1996),41 Conn. App. 754, 763, 677 A.2d 479, quoting Iamartino v. Avallone, (1984),2 Conn. App. 119, 125, 477 A.2d 124. Official Comment 1 to Section 2-302 of the Uniform Commercial Code, adopted in Ohio in R.C. 1302.15, states "[t]he basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract."
In its February 23, 2001 decision, the trial court concluded defendant established a genuine issue of material fact under the procedural unconscionability prong: whether she exercised a meaningful choice when she entered into the refinancing transaction. However, the court concluded defendant presented no evidence that would allow a reasonable finder of fact to find substantive unconscionability: that the terms of the contract are unreasonable or unfair. In determining the lack of substantive unconscionability, the trial court relied on Walker-Thomas Furniture, supra, at 450, the seminal case on the doctrine of unconscionability, which states in relevant part:
 In determining reasonableness or fairness, the primary concern must be with the terms of the contract considered in light of the circumstances existing when the contract was made. The test is not simple, nor can it be mechanically applied. * * * Corbin suggests the test as being whether the terms are "so extreme as to appear unconscionable according to the mores and business practices of the time and place." 1 Corbin, [Contracts (1863), Section 128, Note 2.] We think this formulation correctly states the test to be applied in those cases where no meaningful choice was exercised upon entering the contract.
The trial court observed that the refinancing contract at issue "calls for an interest rate of 14% and monthly payments of more than $1,400.00 per month." (Feb. 23, 2001 decision, 9.) The court further noted that, according to defendant, her previous mortgage had an interest rate of nine percent and monthly payments of approximately $1,200, with additional monthly payments of $176 on the earlier $6,000 pool loan transaction with Beneficial. The trial court stated: "[t]hus it appears that her total monthly payments increased slightly after the refinancing transaction and her mortgage interest rate increased from 9% to 14%. * * * [I]t cannot be said that a mortgage interest rate of 14% is `so extreme as to appear unconscionable according to the mores and business practices of the time and place.'" Id. at 10. In her corrected brief, defendant contends the trial court's conclusion that defendant's total monthly payments increased slightly is "totally inaccurate."
According to a credit analysis performed by Beneficial prior to the refinance agreement, defendant had an outstanding mortgage of $111,785 on her home, with total monthly mortgage payments of $1,218, including taxes and insurance on the home. In addition, defendant had monthly loan payments of $176 on the earlier $6,000 pool loan with Beneficial that had a payoff amount of $4,017 as of May 1998. The total monthly payments on the home and pool before the refinancing were $1,394. Defendant's primary mortgage prior to the refinancing had an interest rate of nine percent. According to defendant, she did not fail to make any payments on that mortgage.
Pursuant to the terms of the refinance agreement with Beneficial, defendant had an initial interest rate of fourteen percent on a principal amount of $125,600, payable over thirty years with an initial monthly payment of $1,488.19. As part of the agreement, defendant paid $2,512 in points and $1,256 for an annual credit line charge.
The refinance agreement, however, is an adjustable rate loan in which the interest rate is calculated quarterly, or four times each year. To determine the interest rate to be applied to the outstanding loan balance for the next quarterly payment period, a base interest rate of 8.3125 is added to the LIBOR Index Rate published in the Wall Street Journal. The refinance agreement provides for a maximum annual rate of twenty-one percent, plus possible additional finance charges. Moreover, the refinance agreement is secured by an "open-end mortgage" on defendant's home. The refinance agreement does not include payment of taxes or insurance on defendant's home, which, according to defendant's request for reconsideration submitted below, amounted to $131 per month for taxes and $25 per month for insurance.
The refinance agreement reflects that part of its proceeds were used to pay part of the outstanding pool loan payoff amount of $4,017. Specifically, the refinance agreement states that $2,077.37 was paid on the earlier loan between defendant and Beneficial. For the balance of the pool loan, defendant and Beneficial entered into a separate new loan agreement whereby defendant agreed to make payments of $74 a month for three years at an interest rate of 20.71 percent. This loan is secured by unspecified "certain household items."
Contrary to the trial court's characterization of the increase in the total monthly payments as "slight," the documentary evidence submitted to the trial court reveals defendant had monthly payments of $1,394 on her home and pool, including home insurance and taxes, before entering into the refinance agreements with Beneficial. After the parties entered into the refinance agreement, defendant's initial monthly payments to Beneficial were approximately $1,562 on her home and pool, and, according to defendant, she had separate monthly payments of $156 for home insurance and taxes, for new total monthly payments of $1,718. The difference between the monthly payments before and after defendant's refinancing of her home is an increase of $324, which is significant in light of defendant's difficulty paying even the lower monthly amount — a difficulty of which Beneficial was aware.
In addition, the trial court's focus was too narrow and its application of the test enunciated in Walker-Thomas Furniture too mechanical. While a mortgage interest rate of fourteen percent is not, in and of itself, "so extreme as to appear unconscionable according to the mores and business practices of the time and place," the interest rate and the other terms of the transaction are so unreasonably favorable to Beneficial as to be unconscionable "in light of the circumstances existing when the contract was made," as illustrated by the following evidence. Walker-Thomas Furniture, supra.
Before her refinance with Beneficial, defendant had a mortgage rate of nine percent. After the refinance, defendant had a home financing agreement with an initial rate of fourteen percent, variable up to twenty-one percent, despite apparent assurances of Beneficial's employee that he would secure defendant a rate lower than her nine percent mortgage rate. Significantly, under the terms of the refinancing agreement, defendant could be liable for paying an interest rate more than twice that of her previous mortgage rate, contrary to her expectation of a lower interest rate. Although the evidence indicates defendant was informed prior to signing the refinance agreement that the interest rate would be fourteen percent, which she futilely protested, nothing in the record suggests defendant was informed the rate was a variable rate that could be as high as twenty-one percent.
Moreover, nothing in the record indicates defendant was given an opportunity to review the documents before signing them. Rather, the record suggests the refinance agreements at issue are adhesion contracts: contracts imposed and drafted by a party of superior bargaining power which relegate to the subscribing party only an opportunity to adhere to the contracts or reject them. See Williams v. Aetna Fin. Co. (1998), 83 Ohio St.3d 464, 473, certiorari denied (1999),526 U.S. 1051, 119 S.Ct. 1357; Patterson v. ITT Consumer Fin. Corp. (1993), 14 Cal.App. 4th, 1659, 1664, 18 Cal.Rptr.2d 563, 566, certiorari denied (1994), 510 U.S. 1176, 114 S.Ct. 1215. Indeed, evidence presented to the trial court suggests defendant was met with vague threats of unspecified "other action" in response to her attempt to reject the contracts, and she was not allowed to timely rescind the agreements after signing them.
In addition, Beneficial's financial position improved significantly, and defendant's financial position declined markedly, as a result of the parties entering into the refinance agreements. Before the refinancing, Beneficial had a security interest in some stereo and video equipment and defendant was at risk of losing the above-ground pool; according to defendant, she had no problems in making the previous mortgage payments on her home. After the refinancing, Beneficial had a security interest in unspecified household items, in the pool, and in defendant's home; defendant then became at risk of losing not only the pool, but also of losing her home to Beneficial because of her inability to make the higher monthly payments.
Concern with unconscionable lending practices is growing. See Note, Predatory Lending: Practices, Remedies and Lack of Adequate Protection for Ohio Consumers (2000), 48 Clev.St. L.Rev. 607. Where similar factors have been present, other courts have refused to enforce finance agreements on the basis of unconscionability. See Family Fin. Serv., supra, at 764 (holding mortgage transaction substantively unconscionable where terms of mortgage, including a twenty percent interest rate, were unreasonably favorable to mortgagee, it was apparent to mortgagee that mortgagor would be unable to make the payments required by the mortgage, and mortgagor lacked a reasonable opportunity to understand the terms before signing the contract). See, also, Aetna Fin. Co., supra (holding arbitration clause in loan agreement for home equity loan unconscionable and thus unenforceable where evidence was presented that lender collaborated in a scheme to prey on elderly African-Americans in certain specific low-income neighborhoods and made home repair loans with knowledge that borrowers could not make required monthly payments).
Most recently, the United States District Court issued a decision involving four elderly, unmarried female borrowers who brought an action against a mortgage lender contending the lender targeted single, elderly females for unfair loan practices. See Matthews v. New Century Mtge. Corp. (S.D.Ohio 2002), 185 F. Supp.2d 874. In Matthews, the plaintiffs contended they were contacted by a mortgage lender or broker about financing home improvements, but had no opportunity to review the loan documents before signing them and were not informed of their three-day right to cancellation. The plaintiffs there relied on the defendants' representations that the loans would result in lower monthly payments when, in fact, the plaintiffs paid high rates and fees for the loans that depleted the equity they had in their homes. At least two of the plaintiffs were led to believe they were entering into loans with fixed interest rates when, in fact, their loans were for adjustable rate mortgages with interest rates of 11.794 percent and 12.952 percent. The defendants threatened foreclosure when the plaintiffs fell behind in their loan payments. Id.
The federal court held the borrowers sufficiently alleged claims that their loan agreements were unconscionable under Ohio law where (1) the terms of the contracts involved in the transactions were so one-sided in favor of the lender as to be unlawful, (2) the mortgage brokers presented contracts to the borrowers to sign which the mortgage brokers had drafted and the borrowers were not allowed to read before signing, and (3) the mortgage borrowers had significantly greater bargaining power, business acumen, and experience than the borrowers. Id.
The evidence here suggests that the terms of defendant's refinance agreements may be at least as one-sided in the mortgage lender's favor as the contracts at issue in Matthews. Defendant presented sufficient evidence to raise a genuine issue of material fact as to whether the refinance agreement entered into with Beneficial is substantively unconscionable. Defendant's third assignment of error is sustained.
The fourth assignment of error asserts the trial court erred (1) in ordering defendant to deposit with the clerk of courts an amount equal to the amount borrowed from Beneficial in order to preserve her TILA claim, and (2) in entering summary judgment on defendant's TILA claim when defendant failed to deposit funds with the clerk of courts.
The TILA at Section 1635(a), Title 15, U.S. Code requires a creditor, such as Beneficial, to disclose to an obligor, such as defendant, that the obligor has the right to rescind the transaction "until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section * * * whichever is later." If the information and forms required under Section 1635(a), Title 15, U.S. Code are not delivered to the obligor or do not otherwise meet the disclosure requirements of the act, the right to rescind the transaction continues for three years after the date of the consummation of the transaction. Section 1635, Title 15, U.S.Code.
In her amended answer, defendant asserts that the agreement and mortgage "were backdated by [Beneficial] in order to deprive [her] of her right to rescind within three business days." The documents are dated June 22, 1998, and defendant claimed in her deposition that the only date on which she signed any documents in connection with the refinancing was June 25, 1998. Defendant seeks rescission. The trial court found a genuine issue of material fact as to whether Beneficial violated the TILA notice requirements, but also concluded that the existence of a genuine issue of material fact did not necessarily entitle defendant to a trial on the issue.
Although the TILA generally provides that in a rescission the creditor shall perform first, the act gives courts discretion to devise other procedures, including conditioning rescissions upon the debtor's prior return of the loan principal. See, e.g., Rudisell v. Fifth Third Bank (1980), 622 F.2d 243; Federal Deposit Ins. Corp. v. Hughes Development Co., Inc. (1991), 938 F.2d 889, certiorari denied, 502 U.S. 1099,112 S.Ct. 1181. During her deposition, defendant testified that she was not currently able to tender back the amount borrowed from Beneficial. However, in her memorandum contra, defendant asserted that she might be able to borrow sufficient funds, given a reasonable time to make financing arrangements.
Accordingly, the trial court ordered that, if defendant intended to pursue her TILA defense and potential right to rescission, she was required to deposit the sum of $125,600 with the Franklin County Clerk of Courts on or before March 20, 2001. As noted by the trial court, this procedure is directly supported by Lynch v. GMAC Mortgage Corp. (Bankr.Ct.N.H. 1994), 170 B.R. 26. On March 22, 2001, finding defendant had failed to deposit the funds with the clerk of courts, the trial court entered summary judgment in favor of Beneficial. In her corrected brief, defendant asserts the trial court erred in the amount defendant was ordered to deposit. According to defendant, the amount the court ordered "should have been reduced by the amount Beneficial paid themselves."
Defendant fails to specify the alleged "amount Beneficial paid themselves." Beneficial suggests defendant may be addressing closing costs paid to Beneficial. The refinancing agreement reflects that of the $125,600 credit line initial advance to defendant (1) $2,512 was for payment of "points" and $1,256 was for payment of an "annual credit line charge," both presumably paid to Beneficial, and (2) $2,077.37 was paid to Beneficial on the earlier pool loan between defendant and Beneficial. The sum of $93,075.12 was paid jointly to defendant and Comerica Bank, and $26,679.40 was paid jointly to defendant and American General, apparently to pay off defendant's previous mortgages. The refinancing agreement reflects that no funds were distributed directly to defendant.
Based on the documentary evidence submitted, the trial court should have ordered the amount to be tendered as a condition of rescission reduced by the amounts Beneficial received as part of the $125,600 sum advanced to defendant. Accordingly, we sustain defendant's fourth assignment of error.
Defendant's fifth assignment of error contends the trial court erred in overruling her March 13, 2001 "Request for Reconsideration" and her May 11, 2001 "Filing for New Trial." On March 13, 2001, defendant, acting pro se, filed a request for reconsideration asking the trial court to rescind its February 23, 2001 written decision. In support, defendant submitted a report from her handwriting expert together with other documentary evidence. On March 22, 2001, following defendant's failure to deposit the sum with the clerk of courts, the trial court filed its written decision sustaining Beneficial's motion for summary judgment on its complaint. The trial court did not address defendant's March 13, 2001 request for reconsideration in its March 22, 2001 decision.
On April 27, 2001, the trial court entered its judgment decree in foreclosure. On May 11, 2001, defendant filed her "Filing for New Trial" asserting her own handwriting expert's report was in error and should be considered invalid, and renewing her request for reconsideration. On May 15, 2001, the trial court filed a decision and entry overruling defendant's March 13, 2001 "Request for Reconsideration" and her May 11, 2001 "Filing for New Trial."
The report of the handwriting expert defendant submitted in support of her request for reconsideration does not support defendant's assertion that her signature on the agreement is not genuine. Moreover, defendant herself asked the court to declare her own handwriting expert's report to be invalid. Defendant's fifth assignment of error is overruled to the extent it is based on her claim regarding the handwriting expert. However, to the extent defendant's "Request for Reconsideration" and her "Filing for New Trial" are based on her contention she established a genuine issue of material fact regarding the defense of unconscionability, we sustain defendant's fifth assignment of error.
The sixth assignment of error asserts the trial court erred in its "Judgment Decree of Foreclosure" when it referred to "a certain promissory Note." In her corrected brief, defendant asserts that "[s]uch a document has never surfaced and was not ever made a part of this case by Beneficial."
The judgment decree in foreclosure's reference to "a certain promissory Note" is to the "credit line account agreement" at issue in this action. That document has indeed been made a part of the record in this case. Accordingly, the sixth assignment of error is overruled.
For the foregoing reasons, defendant's first, second, and sixth assignments of error are overruled, the third and fourth assignments of error are sustained, the fifth assignment of error is overruled in part and sustained in part, and the case is remanded to the trial court for further proceedings consistent with this opinion.
Judgment affirmed in part and reversed in part; case remanded.
BRYANT, J., PETREE, J., and TYACK, P.J., concur.